GROSS INCOME TAX DIV. *v.* OWENS-CORNING
FIBERGLAS CORP.

[No. 1267 S 162. Filed November 3, 1969. No petition for rehearing
filed.]

*John J. Dillon,* Former Attorney General, *Charles D. Rodgers,* Deputy Attorney General, *Theodore L. Sendak,* Attorney General and *Hugh R. Couch,* Deputy Attorney General, for appellant.

*George B. Gavit, Ice Miller Donadio & Ryan, James F. Kennedy, Jr.,* of Indianapolis, and *James F. Kennedy, Jr., Mar-*

*shall, Melhorn, Bloch & Belt,* of Toledo, Ohio, and of counsel, *Ice Miller Donadio & Ryan,* Indianapolis, and *Marshall, Melhorn, Bloch & Belt,* Toledo, Ohio, for appellee.

JACKSON, J.—This action was commenced by the appellee in the Marion Circuit Court to recover certain gross income and veterans' bonus taxes for the years 1953 through 1958.

Appellee's complaint was filed in the trial court on June 12, 1961, alleging, substantially, that the taxes complained of were illegally collected in that they were imposed on income derived from sales made in interstate commerce, and thus in violation of Ind. Ann. Stat. § 64-2606 (a) (1961). On January 31, 1967, the trial court entered its findings of fact and conclusions of law, and rendered judgment for the appellee. The judgment reads as follows:

> "This cause having come on for trial, evidence having been submitted by Plaintiff and Defendant; the matter having been taken under advisement by the Court, the parties having submitted briefs and argument, and the Court being duly advised, and having made and filed its findings of fact and conclusions of law and having found that the Plaintiff is entitled to recover of and from the Defendant for the taxes and interest paid, together with interest on such sums from the dates of payment to the date of judgment, now therefore;

> It is hereby ordered, adjudged and decreed that Plaintiff recover of and from the Defendant the sum of $16,674.41 for the taxes paid, plus the sum of $4,227.47 for the interest paid on such taxes, plus the sum of $9,108.91 as interest on said sums from the dates of their payment to the date of this judgment, for a total of $30,010.79, plus Plaintiff's costs herein.

> Dated this 31 day of Jan., 1967."

On February 20, 1967, appellant filed its Motion for a New Trial, which reads, in pertinent part, as follows:

> "Comes now the defendant in the above-entitled cause and moves the Court for a New Trial and for grounds therefore, states:

1. The decision of the Court is not sustained by sufficient evidence.

2. The decision of the Court is contrary to law."

The motion was not accompanied by a memorandum pointing out wherein the evidence is insufficient, or the decision contrary to law. On October 3, 1967, the trial court overruled appellant's motion.

On appeal, appellant's sole assignment of error is that the trial court erred in overruling the Motion for a New Trial.

Appellee contends that the only question presented is the claim that the decision of the trial court is contrary to law. It argues that appellant failed to preserve the question of sufficiency of the evidence for the reason that appellant did not challenge, in its Motion for a New Trial and Assignment of Errors, the sufficiency of the evidence as to specific findings of fact and conclusions of law made by the trial court.

In support of this proposition, appellee cites *Edwards* v. *Wyllie* (1964), 246 Ind. 261, 203 N. E. 2d 200, and *Fagel* v. *Fagel* (1968), 250 Ind. 27, 234 N. E. 2d 628. In *Edwards* v. *Wyllie, supra,* the appellant's motion for a new trial stated only two grounds: 1. The decision of the court was not sustained by sufficient evidence; 2. The decision of the court was contrary to law. However, the assignment of errors alleged not only that the trial court erred in overruling the motion for a new trial, but also that the trial court erred in making several conclusions of law. This Court held that errors in conclusions of law must be made a part of the motion for a new trial, and may not be independently assigned on appeal. This ruling was in accordance with Supreme Court Rule 2-6, which reads as follows:

"There shall be attached to the front of the transcript immediately following the index, a specific assignment of the errors relied upon by the appellant in which each specification of error shall be complete and separately numbered. An appellee may of right and without notice likewise assign cross-errors within thirty (30) days after the filing of the

appellant's brief by filing such assignment with the clerk who shall attach the same to the transcript. If two (2) or more parties join in an assignment of errors or cross-errors, it shall be treated as joint and several, unless otherwise indicated.

In the title to the assignment of errors all parties to the judgment seeking relief by the appeal shall be named as appellants, and all parties to the judgment whose interests are adverse to the interests of the appellants shall be named as appellees. Assignment of cross-errors shall use the same title, but immediately thereafter shall designate the parties seeking relief and those against whom relief is sought by assignment of cross-errors. Failure properly to name parties will not be treated as jurisdictional. Amendments may be permitted upon such terms as the court shall direct.

In all cases in which a motion for a new trial is the appropriate procedure preliminary to an appeal, such motion shall be filed and shall separately specify as grounds therefor each error relied upon however and whenever arising up to the time of filing of such motion, and an assignment of error on appeal to the effect that the trial court erred in overruling said motion shall be the only means of raising said asserted errors on appeal. In all other cases and in cases of asserted errors arising subsequent to the filing of the motion for a new trial, such asserted errors may be assigned independently."

However, *Edwards* v. *Wyllie, supra,* does not stand for the proposition that, where findings of fact are entered by the trial court, an allegation in the motion for a new trial that the decision of the trial court is not supported by sufficient evidence must be directed to specific findings of fact. The reason given by the court in *Edwards* v. *Wyllie, supra,* for not considering the sufficiency of the evidence was not that the appellant failed to allege, in his motion for a new trial and assignment of errors, that the trial court erred in a specific finding of fact, but that the appellant waived the question of sufficiency of the evidence by stating in his reply brief that he accepted the court's findings as correct for the purpose of the appeal.

In *Fagel* v. *Fagel, supra,* the appellant-respondent's motion for a new trial alleged only that the decision of the trial court

was not supported by sufficient evidence, and that the decision was contrary to law. On appeal before the Appellate Court the appellant-respondent argued that the evidence was insufficient to support finding of fact No. 10, and conclusion of law No. 5. The Appellate Court reversed, see 225 N. E. 2d 776 (1967), and we granted the appellee's petition to transfer. In that case we held that:

> "Errors claimed in special findings and conclusions of law filed prior to a motion for a new trial must be specified in a motion for a new trial to be presented on appeal, pursuant to Rule 2-6. *Edwards* v. *Wyllie* (1964), 246 Ind. 261, 203 N. E. 2d 200, 202; *Fair Share Organization, Inc.* v. *Phillip Nagdeman & Sons, Inc.* (1963), 135 Ind. App. 610, 193 N. E. 2d 257 (transfer denied) ; Flanagan, Wiltrout, and Hamilton, Indiana Trial and Appellate Practice § 1733, Comment 1 (1963 Supp.) ; 3 Wiltrout, Indiana Practice § 2396, (1967)." *Fagel* v. *Fagel, supra.*

In affirming the judgment of the trial court, we went on to say that:

> "* * * we have no question presented on appeal as to the sufficiency of the findings and conclusions of law specified in the argument section of appellant's brief." *Fagel* v. *Fagel, supra.*

The distinction between *Fagel* v. *Fagel, supra,* and the case at bar is that the appellant-respondent in *Fagel* attempted to challenge, on appeal, *specific* findings of fact and conclusions of law without first assigning them as error in the motion for a new trial and assignment of errors. In the case at bar, however, appellant does not challenge specific *findings of fact* and *conclusions of law,* but, instead, challenges the sufficiency of the evidence as a whole to support the ultimate determination of the trial court.

Thus, although we are precluded from considering possible errors in specific findings of fact and conclusions of law, the alleged errors assigned in the motion for a new trial have been validly preserved and are properly before this Court.

*Edwards* v. *Wyllie, supra; Dorweiler* v. *Sinks* (1958), 128 Ind. App. 532, 148 N. E. 2d 570, 151 N. E. 2d 142.

Further, inasmuch as appellant's motion for a new trial was filed prior to the effective date of Supreme Court Rule 1-14B, a memorandum accompanying the motion for a new trial is not required.

Appellant contends that the decision of the trial court is not sustained by sufficient evidence. In determining questions of this nature, this Court, as a court of appeals, will not weigh the evidence. *Spitler* v. *Schell* (1964), 246 Ind. 409, 205 N. E. 2d 155; *J. I. Case Co.* v. *Sandefur* (1964), 245 Ind. 213, 197 N. E. 2d 519; *Fair Share Organization* v. *Mitnick* (1964), 245 Ind. 324, 198 N. E. 2d 765.

Our sole function in this respect in civil cases is to review the record to determine if there is evidence from which the trial court could have made its determination. *Bassemier* v. *Sartore* (1964), 246 Ind. 365, 205 N. E. 2d 160; *DeSchamps* v. *Board of Zoning Appeals* (1961), 241 Ind. 615, 174 N. E. 2d 581.

Moreover, we will consider only that evidence which tends to support the findings of the trial court together with all inferences which may be reasonably and logically drawn therefrom. *Southport Bd. of Zoning App.* v. *Southside Ready Mix Concrete et al.* (1961), 242 Ind. 133, 176 N. E. 2d 112; *Watson* v. *Watson* (1952), 231 Ind. 385, 108 N. E. 2d 893.

The statute under which the taxes in issue were assessed is Ind. Ann. Stat. § 64-2602 (1961), which reads as follows:

"There is hereby imposed a tax upon the receipt of gross income, measured by the amount or volume of gross income, and in the amount to be determined by the application of rates on such gross income as hereinafter provided. Such tax shall be levied upon the receipt of the entire gross income of all persons resident and/or domiciled in the State of Indiana, except as herein otherwise provided; and upon the receipt of gross income derived from activities or businesses or any other source within the state of Indiana, of all persons who are not residents of the state of Indiana,

and shall be in addition to all other taxes now or hereafter imposed with respect to particular privileges, occupations, and/or activities. Said tax shall apply to, and shall be levied and collected upon, the receipt of all gross income received on or after the 1st day of May, 1933, with such exceptions and limitations as may be hereinafter provided."

The statute under which appellee claims exemption is Ind. Ann. Stat. § 64-2606 (a), *supra,* which reads in pertinent part as follows:

"There shall be excepted from the gross income taxable under this act:

(a) So much of such gross income as is derived from business conducted in commerce between this state and other states of the United States, or between this state and foreign countries, but only to the extent to which the state of Indiana is prohibited from taxing such gross income by the Constitution of the United States of America."

For the purposes of this appeal, therefore, we must look to the evidence most favorable to the appellee to determine if there is evidence from which the trial court could have reasonably concluded that the taxes in dispute were imposed, to an extent prohibited by the Constitution of the United States, on income derived from business conducted in interstate commerce.

The disputed tax was levied on income from sales of appellee's products to National Homes Corporation of Lafayette, Indiana, from 1953 through 1958, as well as on sales to various other customers from June 2, 1958, until the end of that year.

From the record, it appears that during the period in question appellee maintained three offices in Indiana. One office, located in Indianapolis, consisted of approximately six hun-hundred square feet of office space, and was furnished with several desks and chairs, and was equipped with telephone service and some files. The other two offices, located in Fort Wayne and Evansville, consisted of an answering service and a desk. Working out of the Indianapolis office were a branch manager, one or two other men, and an office girl. The other

two offices were each staffed by one salesman who was under the supervision of the branch manager from the Indianapolis office. In addition to the three offices, appellee also maintained an inventory of goods in South Bend, Evansville and Richmond.

According to appellee's former Indianapolis branch manager, he and the other men working out of the Indianapolis office were not engaged in sales, but were engaged in sales promotion. Sales promotion entailed contacting various customers and potential customers in order to generate interest in appellee's products. They also called on various people and businesses to attempt to induce them to buy and use appellee's products. The job also entailed setting up exhibits and displays at product shows and conventions, as well as assisting appellee's distributors during advertising and promotional campaigns. Once a customer purchased appellee's products, the sales promotion personnel visited the customer periodically to assist with any problems that might arise with the product. Although the sales promotion men did not actually write up customer orders, they did, occasionally, pick up purchase orders from customers and forward them to the appropriate office or manufacturing plant.

Prior to June 2, 1958, all orders from appellee's Indiana customers, with the exception of National Homes, were sent to the Indianapolis office. Here they were processed and sent to the various offices and manufacturing plants outside the state. After June 1, 1958, all orders, again with the exception of National Homes' orders, were sent directly to appellee's communications center located in Cincinnati, Ohio. From June 2, 1958, on, the Indianapolis office had nothing to do with processing and servicing customer orders. All pricing, shipping, and other pertinent order information was handled solely by the Cincinnati center. After orders were placed with the Cincinnati center the Indianapolis office received a copy of the acknowledgment sent out by appellee to the customer, and the Indianapolis office also received a copy of the invoice

after the goods were shipped. The purpose of this notification, as described by appellee's employee who was project manager for organization of the communication centers, was to provide appellee's representative in the area with information concerning product sales in relation to his market quota.

During the period in question, the National Homes account was treated specially, and was denominated a "House Account." Sales to National Homes were handled exclusively by a vice-president of appellee who worked out of the corporation's main offices in Toledo, Ohio. He negotiated the sales with the president of National Homes. The negotiations were held in Lafayette, Indiana, and occurred annually from August through September. Although a representative from the Indianapolis office was present during the negotiations, he did not participate in them. The purpose of these sales negotiations was to establish prices and product specifications. Some time subsequent to the negotiations, appellee's Toledo office would send to National Homes a schedule of the agreed upon prices.

The actual ordering of appellee's products by National Homes was done through a type of blanket order. The primary reason for this procedure was to facilitate requirements of the National Homes' accounting department. The blanket order reflected the material specifications, the quantity desired, the territory, and the requested shipping date. The orders did not, however, reflect a price. Shipments against these orders were released one month in advance of the desired shipping date. All inquiries concerning the orders were handled directly between National Homes and appellee's manufacturing plant in Newark, Ohio. The shipments were made by boxcar f.o.b. Newark. Although the blanket orders were sent by National Homes to the Indianapolis office, the sole function of the office with respect to these orders was to forward them to the appropriate out of state facility.

Also, appellee's branch manager from Indianapolis paid almost weekly visits to National Homes. These visits were in

the nature of courtesy calls, and afforded National Homes an opportunity to discuss with appellee's representative any problems that may have occurred with the products. Generally, difficulties with appellee's products were taken directly to the manufacturing plant. Occasionally, however, National Homes would contact the Indianapolis office.

During the period involved, appellee did not maintain a manufacturing plant in Indiana. Further, all billing, payment and credit matters were handled outside of Indiana. This was true for the National Homes' account as well as all other Indiana customers.

The mere fact that a business is engaged in interstate commerce does not of itself afford immunity from state taxation. *General Motors Corp.* v. *Washington* (1964), 377 U. S. 436; *Western Livestock* v. *Bureau of Revenue* (1938), 303 U. S. 250; *Postal Telegraph Cable Co.* v. *City of Richmond* (1919), 249 U. S. 252. However, for a tax on income derived from business conducted in interstate commerce to be valid there must be a sufficient "nexus between such a tax and transactions within a state for which the tax is an exaction." *Wisconsin* v. *J. C. Penney Co.* (1940), 311 U. S. 435, 445. It is because the validity of such a tax depends on the degree of activity carried on within the taxing state that taxes levied on the gross receipts from interstate sales have been highly suspect. *General Motors Corp.* v. *Washington, supra.* This type of tax, of which Indiana's is one, poses the threat of cumulative burdens being placed on interstate commerce since every state has an equal right to tax the commerce that it touches, *General Motors Corp.* v. *Washington, supra; Michigan-Wisconsin Pipe Line Co.* v. *Calvert* (1954), 347 U. S. 157; thus renewing the barriers to interstate trade that the commerce clause, U. S. Constitution, Art. 1, § 8, sought to remove. *General Motors Corp.* v. *Washington, supra; Western Livestock* v. *Bureau of Revenue, supra; McLeod* v. *Dilworth Co.* (1944), 322 U. S. 327. Therefore, for such a tax on gross

income to be constitutionally permissible, it must be apportioned on the basis of the taxpayer's intrastate business activity. *General Motors Corp.* v. *Washington, supra; Portland Cement Co.* v. *Minnesota* (1959), 358 U. S. 450; *Western Livestock* v. *Bureau of Revenue, supra.*

However, the burden of establishing immunity from a tax is on the taxpayer claiming the exemption. *General Motors Corp.* v. *Washington, supra; Norton Co.* v. *Department of Revenue* (1951), 340 U. S. 534. As was said in *Norton Co.* v. *Department of Revenue, supra:*

> "This burden is never met merely by showing a fair difference of opinion which as an original matter might be decided differently. This corporation, by submitting itself to the taxing power of Illinois, likewise submitted itself to its judicial power to construe and apply its taxing statute insofar as it keeps within constitutional bounds."

In the case at bar then, we must determine whether the gross receipts sought to be taxed are fairly related to appellee's business activities within the State.

As to those sales subsequent to June 1, 1958, which were channeled through appellee's communications center in Cincinnati, Ohio, there exists a sufficient nexus between the sales and appellee's intrastate business activities to justify imposition of the taxes in question.

In making this determination, we are guided by the substantial and extensive activities of appellee's sales representatives who resided in Indiana and who worked out of offices located in Indiana. We recognize that the actual consummation of the sales contracts did not take place in Indiana. However, when faced, as here, with such substantial intrastate activities, the mere mechanical process of order entry is not controlling. Although appellee's Indianapolis branch manager termed his work "sales promotion," we must look to the substance and not the form. Appellee's Indiana representatives were purely and simply salesmen. They called on prospective

customers in efforts to persuade these people to use appellee's products. They displayed samples to customers and prospective customers, and also discussed technical specifications with them. Once an order was placed with appellee, the Indiana representatives would call on the customer to assist with any problems that might arise with the products. The type of activity carried on by appellee's resident agents is perhaps best illustrated by the following excerpts from the cross-examination of appellee's Indianapolis manager:

"* * * we try to get architects and engineers to specify insulation on the roof of buildings or the ceilings, for instance, for the City-County Building here, which we were successful on the architect involved. We would try to get engineers to use our pipe covering and duct insulation and duct stops."

Also:

"Q. Did this promotional effort on your part also include contacting existing accounts?
A. Yes, we would follow up on promotions to be sure they didn't buy competitors (sic) stuff."

The following excerpt is illustrative of the type of customer service performed by appellee's resident agents:

"Proper service after you get it specified is varying things. Just like when they were putting in a ceiling for the building here, it is a made-to-order product and there are constantly questions about size, may be an eighth of an inch off because the methods of putting it on differ, it didn't fit too good in the corners. After you once get it specified that is a big item but then another item is product continuity for the contractors or builders."

Perhaps the duties of appellee's Indiana representatives is best summed up by the project manager for the establishment of appellee's communications centers:

"Q. Ordinarily it would be the duty of this promotional salesman to generate sales for Owens-Corning, is that right?
A. That is right."

One of the reasons for maintaining local sales representatives, as stated by Mr. Richards, the project manager, was: "However, as a corporation we feel that customers want a local representative."

In addition to the activities of the sales promotion personnel, appellee maintained three offices in Indiana, and also maintained inventory in warehouses in South Bend, Richmond and Evansvilile.

The case at bar is analogous to *General Motors Corp.* v. *Washington, supra.* In that case, district managers for General Motors worked out of their homes and essentially carried on the business of the corporation in the State of Washington. These district managers advised the automobile dealers under their supervision on such matters as sales organizations, advertising and promotional campaigns. They participated in the training of the dealers' sales forces, and functioned as the direct contact between the dealers and the zone managers located in Oregon. They also assisted the dealers in estimating future order requirements which were filed with the zone manager by either the district manager or the dealer. In addition to the district managers, the corporation also maintained service representatives in the State who assisted the dealers with their service departments, conducted service clinics, and checked to see that the dealers were honoring their contracts with the corporation. Finally, a parts warehouse was also maintained in the State.

In upholding the tax levied by Washington, the Supreme Court said:

"Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity." *General Motors Corp.* v. *Washington, supra.*

In the case at bar, appellee also maintains an extensive "maze of local activities" through which it seeks to "take advantage of its gain on domesticity." Just as in *General Motors Corp.* v. *Washington, supra,* appellee's Indiana representatives, who worked out of offices that appellee maintained in Indiana, performed substantial services in relation to appellee's "functions therein, particularly with relation to the establishment and maintenance of sales, upon which the tax was measured." It is thus clear that the State of Indiana is not prohibited, by the Constitution of the United States, from taxing the gross income in question. Thus, the gross income in question is not exempt from taxation under § 64-2606 (a), *supra.* Therefore, it was error for the trial court to rule that the gross income from sales to customers other than National Homes was exempt from taxation, during the time in question, under Ind. Ann. Stat. § 64-2606 (a) (1961).

Appellee contends, however, that imposition of the taxes in dispute amounts to multiple taxation of interstate commerce in that its sales to Indiana customers are included in computing the Ohio franchise tax. This is a tax on the privilege of doing business in Ohio, and is based on the net worth of appellee's business that is done in Ohio. The Supreme Court of the United States, however, has previously determined that the Ohio franchise tax does not tax interstate commerce, but is only a tax on intrastate business activity. In deciding that the Ohio tax does not reach interstate business, the Court in *International Harvester Co.* v. *Evatt* (1947), 329 U. S. 416, said:

> "Appellant contends that the State has thus taxed sales made outside of Ohio in violation of the Due Process clause. A complete answer to this due process contention is that Ohio did not tax these sales. Its statute imposed the franchise tax for the privilege of doing business in Ohio for profit. The State supreme court construed the statute as imposing the tax on corporations for engaging in business such as that in which taxpayer engaged. One branch of that business was manufacturing. It has long been established that a state can tax the business of manufacturing. The

fact that it chose to measure the amount of such a tax by the value of the goods the factory has produced, whether of the current or a past year, does not transform the tax on manufacturers to something else."

In discussing the tax in relation to income generated from activities by intrastate sales facilities the Court went on to say:

"(The State) treated the sales agencies as conducting one type of business and the factories another. Thus it measured the value of the Ohio Sales agencies' business by the total amount of the preceding years Ohio sales of goods manufactured outside of Ohio as well as those manufactured in Ohio. Here again, appellant's contention that this resulted in taxing out-of-state or interstate transactions or sales in violation of the Due Process clause is wholly without substance." *International Harvester Co.* v. *Evatt* (1947), 329 U. S. 416, 420, 421.

Finally, the Court stated that apportionment is not invalidated merely because receipts from interstate sales are included in the computation of the tax liability. Thus, the Ohio tax is purely a tax on the privilege of transacting intrastate business in Ohio. It does not tax interstate sales.

The burden of proof is on the taxpayer to establish the existence of multiple taxation. *General Motors Corp.* v. *Washington, supra; Portland Cement Co.* v. *Minnesota, supra.* To do so, the taxpayer must demonstrate that a definite burden on interstate commerce exists. *General Motors Corp.* v. *Washington, supra; Portland Cement Co.* v. *Minnesota, supra.*

As was said in *Portland Cement Co.* v. *Minnesota, supra,* at page 463:

"There is nothing to show that multiple taxation is present. We cannot deal in abstractions. In this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense."

In the case at bar, appellee attempted to demonstrate the existence of multiple taxation by establishing that the State

was taxing income that was also being taxed by Ohio. However, as was stated above, the Ohio franchise tax is a tax on intrastate business only, and does not reach proceeds from interstate sales. Thus, appellee has failed to show that multiple taxation is present.

As concerns the sales to National Homes during the period in question, we are of the opinion that these sales were clearly interstate in character and thus immune from state taxation under § 64-2606 (a) *supra*. Unlike the sales to appellee's other Indiana customers, solicitation and order servicing of the National Homes account was done almost entirely by appellee's personnel and offices located in Ohio. As was mentioned above, a vice president of appellee, who was located in Ohio, negotiated the basic sales agreement with the president of National Homes. The negotiations took place annually, and were held in Lafayette, Indiana. All order inquiries were handled directly between National Homes and appellee's manufacturing plant located in Newark, Ohio. Essentially, the only contact between National Homes and appellee's Indiana personnel were the periodic courtesy calls that appellee's Indianapolis branch manager paid on National Homes. The only function that appellee's Indianapolis office performed with respect to the National Homes' orders was to merely forward them to the appropriate out of state facility. Thus, we cannot say that appellee's sales to National Homes were so clearly a product of appellee's intrastate activities so as to allow imposition of the disputed taxes. There does not exist a sufficient nexus between the tax and appellee's business transactions within Indiana, for which the tax is an exaction, to justify levying the tax on the income from sales to National Homes.

The facts concerning the sales to National Homes are somewhat analgous to the so-called "drummer" cases. Those cases involve non-resident salesmen going into a state to solicit orders for goods which are to be manufactured and shipped from another state; the sole contact with the taxing state

being the intrastate solicitation of orders. In deciding that mere solicitation of orders within a state does not form a sufficient basis to impose a tax on the business that may be generated by the solicitation, the Supreme Court of the United States said in *Memphis Steam Laundry Cleaner, Inc.* v. *Stone* (1952), 342 U. S. 389, 392, 393:

> "In the long line of "drummer" cases, beginning with *Robbins* v. *Shelby County Taxing Dist.* 120 U. S. 489, 30 L. Ed. 694, 7 S. Ct. 592 (1887), this Court has held that a tax imposed upon the solicitation of interstate business is a tax upon interstate commerce itself. Whether or not solicitation of interstate busines may be regarded as a local incident of interstate commerce, the Court has not permitted state taxation to carve out this incident from the integral economic process of interstate commerce. As the Court noted last term in a case involving door-to-door solicitation of interstate business, 'Interstate commerce itself knocks on the local door.'
>
> If the Mississippi tax is imposed upon the privilege of soliciting interstate business, the tax stands on no better footing than a tax upon the privilege of doing interstate business. A tax so imposed cannot stand under the Commerce Clause."

As the transactions with National Homes involved essentially interstate solicitation of orders, with very minimal intrastate activity, the State could not constitutionally tax the income produced by the sales to National Homes.

That there is a fundamental difference between the sales to National Homes and appellee's other customers is, we think, quite clear. Appellee's Indiana agents had almost nothing to do with acquiring and maintaining the National Homes account. Rather, that account was acquired and serviced almost entirely by appellee's employees located outside of Indiana. The resident agents did, however, actively attempt to acquire business from appellee's other customers in Indiana. In the name of sales promotion, they called on prospective customers to attempt to induce them to use appellee's products; they showed samples of the products to these potential customers; they discussed product specifications with these potential cus-

tomers; they worked with appellee's distributors in developing and carrying out advertising and promotional campaigns in efforts to generate a larger market for appellee's products. Once orders were placed for appellee's products these resident agents assisted the customers with problems that might arise with the products. In addition appellee also maintained inventory in warehouses located in South Bend, Evansville and Richmond. In short, whereas the National Homes account was almost exclusively the product of interstate transactions, the sales to appellee's other customers which were channeled through the Cincinnati communications center were clearly the product of substantial sales activity carried on by appellee's employees located in Indiana, and who worked out of offices that appellee maintained within the State. It is this substantial and undisputed intrastate activity by appellee's resident employees that distinguishes the sales to the other customers from the sales to National Homes.

Therefore, the judgment of the trial court is affirmed as to those taxes levied on the income from the sales to National Homes. However, the judgment of the trial court is reversed as to those taxes levied on the sales to other Indiana customers and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Hunter, J., concurs; DeBruler, C.J., concurs in result; Arterburn, J., dissents with statement in which Givan, J., concurs with partial dissent.

NOTE.—Reported in 251 N. E. 2d 818.

### DISSENTING STATEMENT

ARTERBURN, J.—I dissent in part on the ground that I feel that the tax should be applicable to the sales made by National Homes also.