MUELLER BRASS CO. *v.* GROSS INCOME TAX DIVISION.

[No. 570S101. Filed January 20, 1971. No petition for rehearing filed.]

*Alan H. Lobley, W. Grafton Sharp, Ice Miller, Donadio & Ryan,* of Indianapolis, *Walsh, O'Sullivan, Stommel, Sharp & Beauchamp,* of Port Huron Michigan, for appellant.

*Theodore L. Sendak,* Attorney General, *Charles D. Rodgers,* Assistant Attorney General, *Hugh R. Couch, Larry J. McKinney,* Deputies Attorney General, for appellee.

HUNTER, J.—Appellant, a Michigan corporation, sought to recover its payments under the Indiana Gross Income Tax for the years 1963, 1964 and 1965. Trial was held before Marion County Superior Court Number 7 and culminated in a judgment for the Gross Income Tax Division of the Indiana State Department of Revenue and against appellant.

Appellant's request for reversal of the trial court centers on the alleged unconstitutional nature of the application of the Gross Income Tax to it in light of the manner in which appellant conducts its business in the state. The existence of the constitutional question vests appeal jurisdiction in this court. Ind. Ann. Stat. § 4-214 (First.) (1968 Repl.)

Appellant assigns as error the trial court's overruling of its motion for new trial. That motion, excluding formal parts and a memorandum in support of grounds one and two thereof which will be considered later, was as follows:

"Comes now the plaintiff, Mueller Brass Company, and moves the Court for a new trial of the above cause for each of the following reasons:

1. The decision of the Court is contrary to law.
2. The Court's Finding of Fact #7 is contrary to law.
3. The Court erred in its Conclusion of law #1.
4. The Court erred in its Conclusion of law #2.
5. The Court erred in its Conclusion of law #3.
6. The Court erred in its Conclusion of law #5.
7. The Court erred in its Conclusion of law #6.
8. The Court erred in its Conclusion of law #7.
9. The Court erred in its Conclusion of law #8.

WHEREFORE, the plaintiff prays that the Court grant a new trial herein or, in the alternative, that it amend its Findings and Conclusions pursuant to Rule 1-8 of the Supreme Court of Indiana."

Appellant Mueller divided its sales within the state into three classes for purposes of trial and appeal. The first involves so-called "standard products" which are items in constant stock and sold on an order basis. The second is denominated "industrial products" which are items produced for specific needs of a certain customer. The third is called "house accounts" which consist of long standing relationships in the form of an order or orders calling upon Mueller to manufacture and deliver items to a particular customer over an extended time period.

The trial court's seventh findings of fact delineates how, in its view, appellant's various classes of sales were made and the accounts serviced by appellant. That finding is as follows:

### "Finding No. 7

"During the taxable years in question, the plaintiff operated in Indiana upon the following basis: Mueller Brass Co. is a manufacturer of non-ferrous metal products, all of which is done outside the State of Indiana. It makes what it calls 'standard products' which are sold to plumbing and refrigeration wholesalers and manufacturers. Examples of these types of customers were described as the Plumbers Supply Company, The Duncan Supply Company, and the Langsenkamp Company, all of Indiana.

The plaintiff also manufactures what it terms as 'Industrial Products' which is (sic) custom manufactured on particular orders.

The plaintiff had employees in the State of Indiana, including salesmen, office manager, and office personnel. Some of these employees resided in Indiana, particularly the employees employed at the Indianapolis office. For the past many years, plaintiff maintained an office in Indianapolis, its present address being 2201 East 46th Street, Indianapolis, Indiana. It also maintained a warehouse in Indianapolis until the middle of 1962. Plaintiff's name was listed on the building directory at the above address. Plaintiff was also listed in the Indianapolis telephone directory.

The plaintiff paid Indiana employment taxes, personal property taxes, and adjusted gross income taxes in the State of Indiana.

Plaintiff's Indianapolis office consisted of a sales manager, an assistant sales manager and a secretary and, according

to plaintiff, covered a territory which consisted of two-thirds of southern Indiana and a northern portion of Kentucky. The sales manager and assistant sales manager worked as a team of salesmen, working as salesmen sometimes together and more often separately. They made calls on plaintiff's customers in their territory on a full time basis. They called on wholesalers and manufacturers of plumbing and refrigeration products. They made their customers acquainted with the plaintiff's line of merchandise and special products by personal contact, providing advice and technical assistance, providing catalogs and brochures and generally devoting their time to obtain sales and to get business. They instructed their customers to send their orders by mail to the plaintiff's offices in Port Huron, Michigan, but would, on occasion, pick up orders and send them to Port Huron for processing. A copy of the acknowledgement of all orders in the Indianapolis territory was forwarded to the Indianapolis office. These copies were used by the employees of the Indianapolis office for the purpose of checking on shipments, back orders, damaged or faulty merchandise and customer complaints. The Indianapolis office was kept constantly informed concerning any sales in its territory. In calling on potential customers, salesmen would pick up engineering prints and data and acknowledge the possibility of the manufacture of special parts.

Salesmen furnished technical assistance to customers and advised them on manufacturer's problems, for example, one salesman testified that he gave soldering lessons for customers. Calls were made on customers at various times, usually every three to four weeks.

The sales materials including Standard products catalogs, plumbing and hearing (sic) catalogs, and other brochures which were distributed by the plaintiff. They had the plaintiff's Indianapolis address and telephone number imprinted in or on them. These materials were distributed either by the salesmen, or by mail, to plaintiff's Indiana customers.

Orders were shipped from warehouses either in Port Huron, Michigan, Chicago, Illinois, or St. Louis, Missouri. As mentioned here before, the Indianapolis office receives copies of these orders and the Indianapolis office keeps a running file showing what customer in the area placed an order. The Indianapolis office made follow-ups on these orders to see that they were shipped without delay. If it was a back order, it became important to give the customer service by using the follow-up system by the Indianapolis

salesmen. In this way, the Indianapolis office made sure that the customers' orders were actually received.

Indianapolis salesmen attended and conducted demonstrations in Indiana at conventions and meetings of the Refrigerator-Service Engineers Society and plumbers' organization.

Indiana salesmen were paid a straight salary and commission was based on a quota for the year. A quota was set for the year and after the quota was reached, the salesmen received additional compensation on Indiana sales in excess of the quota."

Grounds one and two of appellant's motion for new trial, and the memorandum in support thereof, relate to said finding by the court and challenge the propriety thereof. We must therefore examine the portions of finding #7 challenged by this appeal.

The new Indiana Rules of Civil Procedure went into effect after December 31, 1969, and apply to all actions begun after that date and, if an injustice would not result, to all actions then pending. Trial Rule 52 reads in part as follows:

"On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless *clearly* erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses . . ." (our emphasis)

This rule is in accord with the general import of earlier cases recognizing an appellate court's duty to accept a trial court's findings of fact if there is evidence of probative value to support them. *Bassemier* v. *Sartore* (1965), 246 Ind. 365, 205 N. E. 2d 160; *Miller* v. *Ortman* (1956), 235 Ind. 641, 136 N. E. 2d 17.

With said rules of appellate jurisdiction in mind we shall consider seriatum the paragraphs of appellant's memorandum in support of a portion of its motion for new trial.

The first paragraph is as follows:

1. The Court treated all of the plaintiff's business in Indiana as though it was all done through the Indianapolis office."

If by this assertion appellant means that the *result* to it of the trial court's decision was similar to what would have been the result had all sales been found to be the work product of the Indianapolis office, and only the Indianapolis office, we must agree. This does not, however, make the decision patently contrary to law. The test is whether their treatment is *proper* and not whether their treatment is similar or dissimilar to the sales which were solely the product of the efforts of Indianapolis based employees.

If by this assertion appellant means that the trial court did not recognize that employees other than those residing in Indianapolis took part in Indiana sales efforts, we feel appellant is incorrect.

For example the court stated in its finding that:

"The plaintiff had employees in the State of Indiana, including salesmen, office manager, and office personnel. *Some of these employees resided in Indiana, particularly the employees employed at the Indianapolis office.*" (our emphasis)

and that:

"Plaintiff's Indianapolis office . . . covered a territory which consisted of two-thirds of southern Indiana and a northern portion of Kentucky."

and that the Indianapolis office:

". . . made calls on plaintiff's customers *in their territory* on a full time basis." (our emphasis)

This makes it clear that the court took cognizance of the fact that the Indianapolis employees did not directly produce all business done by Mueller in the state.

The second paragraph of appellant's memorandum was as follows:

"2. The Court failed to recognize that the sales in the northern third of the State of Indiana were in no way related to the activities of the Indianapolis office, but all contact with customers in the northern third of Indiana was from the Chicago, Illinois office or the Port Huron, Michigan office of Mueller Brass Company."

Appellant makes two assertions by this paragraph, (1) that sales in the northern district would have been made whether or not the Indianapolis office existed and that the trial court did not recognize this, and, (2) that all contact from the company to customers in the northern district initiated from an office other than Indianapolis and that the trial court did not recognize this fact.

We disagree with the first assertion. It is clear by inference that the court did not feel sales would have been as readily made in the northern sector without the Indianapolis office. If there is evidence of probative value to support this finding and it is not clearly erroneous we may not disturb it. Trial Rule 52: *Bassemier* v. *Sartore, supra; Miller* v. *Ortman, supra*.

This court is of the opinion it must take judicial notice of the fact that the availability of contact between a manufacturer and its customer is a factor in determining whether a particular product is purchased. When that source of possible contact is available within the potential customer's state we feel that that too would be a factor to be weighed by him. This is perhaps especially true where a continuing relationship is contemplated. That a given customer may never in fact use the local source for an emergency or other contact is not persuasive. The fact that such an avenue is available and could be used must be accorded as being of some significance to potential customers.

One of appellant's key employees testified that:

"Q. Now, you stated on direct examination that you send out brochures or literature concerning product lines and price lists. When those are sent to Indiana customers, is there any indication upon those brochures or price lists sent to Indiana customers of your local representative's office?

A. Is there any indication on them?

Q. Yeah, where the local office is located or the representative's name?

A. Yes, in most of our standard products catalogs on the back page of our plumbing and heating catalog, and on the back page of our refrigeration catalog, we have listed over a number of years and it would entail all of the years involved here, a list of our warehouses and our sales territories by name. In some instances, name and telephone number.

Q. That's your local sales representative?

A. Of the sales office, not the representative,—

Q. But the sales office?

A. —but the facility, yes, sir.

Q. Alright. The Indianapolis office would be listed on that brochure?

A. Yes, sir.

Q. Along with its address and telephone number?

A. Yes, sir."

and that:

"Q. Now if there were a convention of plumbers or refrigeration men in the State of Indiana, it would be possible that you would send your local sales representative to those conventions to display your product or give a talk concerning those products?

A. Yes, sir. Yes, sir."

Such evidence indicates that a local image of some scope was sought to be fostered by appellant. There is, then, some evidence to indicate that an avenue of contact through the Indianapolis office was held open to all appellant's Indiana customers. It does not seem improper to infer that this was a factor considered by potential customers and that the existence of the Indianapolis location played some part in their buying decisions.

We feel we must concur with the second of appellant's assertions insofar as it relates to the fact that direct personal

contact with customers in the northern sector was not *initiated* by the Indianapolis office. But, it appears that the trial court also took this into account in making its seventh fact finding. It noted that the Indianapolis office covered only the southern two thirds of the state in its sales efforts.

The third paragraph of Mueller's memorandum is as follows:

"3. There is no evidence in the record to support the Court's Finding that in sales through the Chicago office, the Indianapolis office receives copies of the orders and that the Indianapolis office keeps a running file showing what customers in the area placed an order; that the Indianapolis office made follow-ups on the orders of the Chicago office to see that they were shipped without delay; and that the Indianapolis office made sure that the customers' orders were actually received."

We find nowhere in the seventh finding of fact that the trial court made any such findings. On the contrary, the finding stated that:

"A copy of the acknowledgement of all orders *in the Indianapolis territory* was forwarded to the Indianapolis office." (our emphasis)

While later references are made to follow-up activities "in the area," we interpret this to mean in the Indianapolis sales territory. There is ample evidence in the record that follow-up activity was undertaken in the Indianapolis sales area.[1]

1. One of appellant's officers testified as follows:
"Q. Now what does the local sales representative do with that acknowledgment?
A. What does he do with that? First of all, he keeps a file of it, a running file, and this shows him first of all whether he—what customer he's—what customer in the area has given him an order recently and *he also follows up on that order* over a period of time with the main office to see that it's shipped properly without delay. If there's a back order on it, this is always important because he wants to give the customer service and it's used as a follow-up of the order by the salesman." (our emphasis)
and later that:
"Q. And as these documents come in with respect to that how do you use them in the Indianapolis office?

Mueller's fourth paragraph stated that:

"4. The Court failed to recognize that the house account sales to Northern Indiana Brass Company and to Avco are in no way related to the activities of the Indianapolis office, but are handled solely by the Port Huron, Michigan office of Mueller Brass Company."

Appellant is correct in contending that the trial court did not find that the house account sales *were in no way related* to the activities of the Indianapolis office. This is undoubtedly because they *were* related. The *possibility* of local avenues of contact, as discussed in conjunction with appellant's paragraph two (2) earlier, apply just as well to the house sales. Further, there was testimony in regard to the house accounts that:

"A. Yes, In each sales territory there are, you know, one or two sometimes that are called house accounts. House accounts originate from our ordnance division particularly, where the salesmen may have never even seen or talked to anyone regarding an ordnance part for the Army, Navy, whatever it might be. And there are some specials that as an example, in northern Indiana actually, one of our competitors that we purchase parts from. They purchase parts from us. Northern Indiana Brass Company. And our sales representatives, as such,

A. I look at them and then they're filed.

Q. And how do they become useful to you?

A. Well, should a customer call in and want some information on delivery or how the order stands I do have a copy there that I can be looking at the same time he is on the other end of the phone to make it a little easier for the two of us to discuss the item."

At still another point he related the following:

"Q. Well, from the standard products, do—

A. Standard products. Here again they go to the warehouses and are processed as routine. And so, our salesmen insofar as orders themselves are concerned only get involved when there's a customer complaint because he didn't get the proper goods or he didn't get it on time or a service problem. He may get directly involved then and that is the purpose, of course, of our showing and having a record at the sales territory offices of the acknowledgments of these orders, so he'll know what's going on."

have no reason to call on them and we do quite a good deal of business with them actually. But they *usually* do not call on house accounts. *There could be some special instances where we may ask them to call if a problem arises,* but generally speaking in the house accounts they do not call." (our emphasis)

and that:

"Q. In other words, it was not generated by sales representatives that were located within the State of Indiana?

A. It was not. No, it was not, *now it was serviced several times* at the request of our ordnance division and our sales manager under the ordnance division and our sales manager under the ordnance division who came into the Indiana territory and met with Mr. DeNardin and *our sales representative in Indiana has worked on this account* in the past at the request of the ordnance division. He's not usually requested to do this sort of thing, but it's been done." (our emphasis)

So, it is evident that the continuing relationship between Mueller and the house accounts (at least the Avco account since it was located in the Indianapolis territory) was related to the Indianapolis office and that they were not handled *solely* by Mueller's Port Huron, Michigan personnel.

The fifth paragraph of appellant's memorandum in support of its motion for new trial states:

"5. There is not evidence in the record to support the Court's Finding that in house account sales, the Indianapolis office receives copies of the orders and that the Indianapolis office keeps a running file showing what customers in the area placed an order; that the Indianapolis office made follow-ups on the house account orders to see that they were delivered without delay; and that the Indianapolis office made sure that the house account orders were actually received."

The trial court did indicate in its seventh finding of fact that copies of all orders from the Indianapolis territory were sent to the Indianapolis office. The finding is supported by

testimony in the record as to various of the classes of sales into which appellant has chosen to divide its operations.[2]

While house accounts, as Mueller has denominated them, are not covered specifically, one of appellant's sales representatives in the Indianapolis office testified:

"Q. Now what records are kept in that office with respect to sales made in the State of Indiana?

A. Well, the only records I have are mailed to me from Port Huron on the sales of *all* our customers and this is sent to me rather than—I don't keep any records of this myself." (our emphasis)

This seems to indicate that records were available and that follow-up facilities were available if the house accounts chose to use them. While we find no direct testimony that it was in

---

2. As to standard products appellant's vice president testified:

"Q. And when, say he sent a purchase order to Chicago, what would happen when that purchase order got to Chicago as far as the processing of the order would be concerned?

A. Well, we would make out our own order on our own order form and ship what goods we had in stock. If there were any back orders, we, of course, would acknowledge this on a form to him and an acknowledgment of that order, again, a copy would be sent to our Indianapolis sales territory, and we'd make the shipment directly to the customer from the Chicago warehouse."

and also that:

"Q. Well, from the standard products, do—

A. Standard products. Here again they go to the warehouses and and are processed as routine. And so, our salesmen insofar as orders themselves are concerned only get involved when there's a customer complaint because he didn't get the proper goods or he didn't get it on time or a service problem. He may get directly involved then and that is the purpose, of course, of our showing and having a record at the sales territory offices of the acknowledgments of these orders, so he'll know what's going on."

With regard to industrial products the record discloses the following testimony by the same witness:

"Q. And what happens when that order is received in Port Huron?

A. We transfer it usually to our own, in other words, order form. We send an acknowledgment of that to our sales territory. This order, if it had been received from the Indianapolis sales territory, they would get an acknowledgment of that order, and also the customer would get an acknowledgment of our order on our own form. Then we would proceed from there."

fact used in any given instance it is clear that a communication line had been staffed. It is amply clear that definite follow-up work was done using the order records kept at the Indianapolis office in regard to at least some orders.[3] It does not seem unreasonable to infer that the records of *all* sales were available for the purpose of handling *any* follow-up matter presented by *any* customer. We do not regard such an inference as clearly erroneous and do feel there is evidence of probative value to support it.

We turn now to the sixth paragraph of appellant's memorandum. It alleges that:

"6. The Court ignored the uncontradicted evidence that the Indianapolis office had nothing to do with the sales in the northern third of Indiana, but that all sales in that area were handled by the Chicago office and that the plaintiff had no salesmen calling on the northern third of Indiana who resided in the State of Indiana."

We regard it as being, in substance, but a restatement of the second paragraph of the memorandum and regard the discussion of that portion as equally applicable to this one.

The seventh challenge to the court's seventh finding of fact is stated by appellant as follows:

---

3. Appellant's vice president related that:

"A. Standard products. Here again they go to the warehouses and are processed as routine. And so, our salesmen insofar as orders themselves are concerned only get involved when there's a customer complaint because he didn't get the proper goods or he didn't get it on time or a service problem. He may get directly involved then and that is the purpose, of course, of our showing and having a record at the sales territory offices of the acknowledgments of these orders, so he'll know what's going on."

And one of appellant's salesmen testified as follows:

"Q. Now when you call on standard products customers, when you make a call, what would happen on that call, I mean what would be the thing that would occur when you called?

A. Well, I am there primarily to show my product, maybe new ones we might have coming out, introducing a new product, maybe asking if our service end was alright, if they have any complaints with shipments, back orders, what have you—just a general help to them with their contact with the plant."

528

"7. The court ignored the uncontradicted evidence that the two (2) house accounts in Indiana were serviced by Mueller Brass Company's office in Port Huron, Michigan and that the Indianapolis office had nothing to do with sales to those house accounts."

We concur with appellant that the trial court's seventh finding of fact does not specifically indicate that the house accounts were serviced by Port Huron, Michigan personnel. This is undoubtedly because they were not serviced *solely* by such personnel and due to the fact that the court was of necessity concentrating on what Indiana personnel did.

As to direct sales effort with regard to the house account in the northern sector, the court did indicate that the Indianapolis office called on accounts in *its* territory, and that it received copies of orders by customers in *its* territory. However, as discussed in conjunction with appellant's second memorandum paragraph, this does not mean that the Indianapolis office had nothing to do with these sales.

The allegation that the Indianapolis office had *nothing to do* with the house account in its territory has been shown to be in error in discussion of earlier portions of Mueller's memorandum.

Appellant's eighth paragraph challenges the court's seventh finding on the basis that:

"8. There is no evidence to support the Court's Finding that the plaintiff instructed their customers to send their orders by mail to the plaintiff's office in Port Huron for processing."

There is direct evidence to the contrary in the record. For example, in discussing orders of standard products:

"Q. And do you tell your customers not to give you orders particularly or how does that come about?

A. Oh, I don't actually tell them not to give me an order but *I will suggest that they mail them direct*, as a time-saver. If they mail them themselves it will save a couple days possibly in the mail." (our emphasis)

As to industrial products there was testimony to the effect that:

"Q. Now after the price had been fixed on one of these fabricated products, how would Mueller Brass receive an order for the manufacture of that product?

A. Directly from the manufacturer.

Q. And would that be generally a written order?

A. Yes, it would be a written order from the manufacturer.

Q. From the customer?

A. From the customer, yes.

Q. And generally how do you receive those written orders, through the mails, or—?

A. Through the mails, yes, sir.

Q. And do they come direct from the customer, or do they come from a sales office?

A. They come direct from the customer."

While this does not state that Mueller told customers buying industrial products to order by mail, it is certainly proper to infer that appellant at least encouraged it. It is true that there is testimony that some orders were mailed by customers to offices other than the Port Huron, Michigan office. We do not regard this as destructive of the validity of the court's finding of fact. The court did find that:

"They instructed their customers to send their orders by mail to the plaintiff's offices in Port Huron, Michigan, but would, on occasion, pick up orders and send them to Port Huron for processing."

But, we regard the thrust of the finding to be directed at the fact that orders were mailed to appellant's offices and warehouses outside the state. We do not feel that the fact that the trial court may have neglected to mention that orders were likewise mailed to other non-Indiana offices is so clearly an erroneous statement of the nature of appellant's operations as to render the finding contrary to law. The fact that the orders

traveled in interstate mails is preserved and, to this court, that is the heart of the finding.

The ninth paragraph of appellant's memorandum provides that:

> "9. There is no evidence to support the Court's Finding that the Indianapolis office received copies of all orders for shipment from Port Huron, Michigan; Chicago, Illinois or St. Louis, Missouri nor is there any evidence that the Indianapolis office kept a running file showing what customer placed an order."

To the extent that this paragraph contends that the trial court improperly found that the Indianapolis office obtained copies of all sales acknowledgments relative to all sales in Indiana it is, at least insofar as sales by Chicago based personnel, redundant. We feel it was amply pointed out in our discussion of the appellant's third and fifth paragraphs of its memorandum that the trial court found that copies of all sales *within its territory* were forwarded to the Indianapolis office and that there was evidence of probative value that this was the case.

As to the contention that there is no evidence to indicate that the Indianapolis office had a record of sales made within its territory, we are of the opinion that appellant is in error. We refer to testimony in the record by an officer of appellant:

> "Q. When your company receives an order and the order has been approved, and an acknowledgment of that order is sent to the customer, an acknowledgment of that order is also sent to your local sales representative, is that correct?
>
> A. Yes, sir. That's right.
>
> Q. Now what does the local sales representative do with that acknowledgment?
>
> A. What does he do with that? First of all, *he keeps a file of it, a running file, and this shows him* first of all whether he—what customer he's—*what customer in the area has given him an order recently* and he also follows up on that order over a period of time with the main office to see that it's shipped properly without

delay. If there's a back order on it, this is always important because he wants to give that customer service and it's used as a follow-up of the order by the salesman." (our emphasis)

This we regard as probative matter sufficient to sustain that finding of the trial court challenged by appellant's ninth paragraph.

The tenth and final paragraph of appellant's memorandum states:

"10. There is no evidence to support the Court's Finding that the Indianapolis office made follow-ups on all orders shipped from Port Huron, Michigan; Chicago, Illinois or St. Louis, Missouri to see that they were shipped without delay. There was also no evidence to support the Court's Finding that the Indianapolis office made sure that the customers orders were actually received."

We again must disagree with appellant's assertion. As earlier indicated, there was evidence of probative value that the Indianapolis office received copies of order information on orders submitted by customers in the Indianapolis territory. We find it entirely proper to interpret that evidence to mean copies of all orders, no matter to which of appellant's offices it was sent, were sent to Indianapolis. Again, we refer to testimony by one of appellant's officers:

"Q. When your company receives an order and the order has been approved, and an acknowledgment of that order is sent to the customer, an acknowledgment of that order is also sent to your local sales representative, is that correct?

A. Yes, sir. That's right.

Q. Now what does the local sales representative do with that acknowledgment?

A. What does he do with that? First of all, he keeps a file of it, a running file and this shows him first of all whether he—what customer he's—what customer in the area has given him an order recently and *he* also *follows up on that order* over a period of time with the main office *to see that it's shipped properly without*

*delay. If there's a back order on it,* this is always important because he wants to give the customer service and *it's used as a followup* of the order by the salesman.

A. In other words, the local representative does see that the customer is properly serviced and that his orders are received by the local customer?

A. That his orders are—

Q. Yeah. That the local customer's orders are actually received?

A. Received by the main office? Yes, sir. That's right." (our emphasis)

This demonstrates to this court that the finding of the trial court was supported by evidence of probative value and was not clearly erroneous.

This court holds, then, that the findings of fact made by the trial court contain ample validity in light of the evidence in the record to withstand the challenges appellant has presented.

We turn now to a consideration of the conclusions of law made by the trial court as it applied the applicable law to the facts it found.

The conclusions, omitting formal parts, were stated by the trial court as follows:

"Conclusion of Law No. 1
The law is with the defendant and against the plaintiff.

Conclusion of Law No. 2
The Gross Income tax levied and collected by the State of Indiana was upon gross receipts from the sale of manufactured nonferrous metal products within the State of Indiana.

Conclusion of Law No. 3
The plaintiff performs local business activities and services in Indiana; plaintiff maintains an office and employs personnel in the State of Indiana.

Conclusion of Law No. 4
The plaintiff has voluntarily qualified to do business in Indiana through the Indiana Secretary of State's office.

### Conclusion of Law No. 5

The plaintiff's interstate activity is only incidental to the plaintiff's intrastate activity.

### Conclusion of Law No. 6

The plaintiff has elected to localize itself in Indiana with the advantages of local agents to keep close to the trade and to deliver locally many items, and takes orders through locally based agents. The plaintiff cannot through its many local activities gain the advantage of a local business and also hold interstate immunities.

### Conclusion of Law No. 7

The Gross Income tax levied upon the gross receipts from plaintiff's intrastate activities is neither wrongful nor illegal and is not prohibited by the Constitution of the United States or of the State of Indiana; and the plaintiff's gross receipts are not exempted from taxation by the provisions of Section 6(a) of the Gross Income Tax Act of 1933, as amended.

### Conclusion of Law No. 8

The plaintiff shall take nothing by way of its complaint."

By its motion for new trial appellant challenged all but the fourth conclusion. We regard the conclusions challenged as being partially in error. Before considering in what particulars they are deficient, however, it is necessary to review applicable legal precedent to determine how it relates to appellant's business operations within the State of Indiana.

The Indiana Gross Income Tax, Ind. Ann. Stat. § 64-2601— 2668 (1961 Repl. 1970 Supp.), imposes a percentage of gross income as a levy on its receipt. Ind. Ann. Stat. § 64-2603 (1961 Repl. 1970 Supp.) The term "gross income" is defined at some length, Ind. Ann. Stat. § 64-2601 (1961 Repl. 1970 Supp.), however, for our purpose here it is sufficient to note that the essence of the definition is that funds received by one engaged in business within the state are subject to the tax. To assure that only funds which are subject to a state tax are taxed, Ind. Ann. Stat. § 64-2606 (1961 Repl.

1970 Supp.), was enacted. This section provides, in part, as follows:

"64-2606. Exemptions.—There shall be excepted from the gross income taxable under this act [§§ 64-2601—64-2631]:

(a) So much of such gross income as is derived from business conducted in commerce between this state and other states of the United States, or between this state and foreign countries, but only to the extent to which the state of Indiana is prohibited from taxing such gross income by the Constitution of the United States of America. There shall also be excepted from such gross income, salaries, pensions, and other emoluments paid by the United States of America, and interest or other earnings paid upon bonds or other securities issued by the United States of America, but only to the extent that the state of Indiana is prohibited from imposing a tax upon such salaries, pensions, emoluments, interest and/or earnings, by the Constitution of the United States of America."

This section was passed in recognition of the fact that the dictates of the federal Constitution require that states of our union exercise certain restraint when acting upon interstate commerce. Two sections of that document are of special importance in the area—Art. I, Sec. 8, the Commerce Clause and the Fourteenth Amendment Due Process Clause.

The Commerce Clause requires that a state not unduly burden commercial intercourse between the states and is a recognition that the free flow of goods throughout the nation is necessary and desirable. Thus, a state may not, by its tax scheme, discriminate against interstate commerce and in favor of intrastate commerce. *Alaska* v. *Arctic Maid* (1961), 366 U. S. 199; 6 L. Ed. 2d 227. While a state may impose a tax burden that is reasonable in light of the incidence of commercial contact by the taxpayer with it (*Northwestern States Portland Cement Co.* v. *Minnesota* [1959], 358 U. S. 450; 3 L. Ed. 2d 421), a tax system which may produce a multiple taxation burden is proscribed. *Michigan-Wisconsin Pipe Line Co.* v. *Calvert* (1954), 347 U. S. 157; 98 L. Ed. 583.

The Due Process Clause, the other limiting factor, requires that a certain degree of contact or "nexus" exist between the taxpayer and the taxing entity before the imposition of a tax is proper. *General Motors Corporation v. Washington* (1964), 377 U. S. 436; 12 L. Ed. 2d 430.

Turning now to the conclusions of law we note that the first of them relates that:

"The law is with the defendant and against the plaintiff."

Rather than relate in detail why this particular conclusion is partly in error we shall turn to a discussion of the other challenged conclusions which will serve to illustrate the deficiencies contained therein.

The second conclusion relates to the fact that the tax was levied on sales within Indiana. While partly correct, the conclusion overlooks the nature of certain facets of appellant's business. We feel that certain of the sales were not made within the state since sufficient contact between instate activity and the sales did not exist; and, the tax on them exposed appellant to a possible burden of multiple taxation. As to these transactions, then, the tax was improperly applied.

All sales in the northern sector of the state are exempt from the Gross Income Tax. While, as the Court below properly found, certain Indiana based contact is had or is at least held out as available to customers in the northern territory, its incidence of importance in the sale process does not constitute that quantum of contact necessary to render the sales "Indiana sales". Therefore, all sales in the northern territory, even though customers in this area were given appellant's Indianapolis office as a possible source of contact, should not have been subjected to the Gross Income Tax. The evidence shows that such sales were initiated by personnel residing outside the state, that the goods sold were shipped into Indiana from another state, that the orders that were not given directly to the salesmen were mailed to appellant's out-of-state offices, and that the orders were accepted and

payment received at offices located outside of Indiana. Such sales clearly fall outside the realm of the Indiana Gross Income Tax. *Norton Co.* v. *Department of Rev. of the State of Illinois* (1951), 340 U. S. 534, 95 L. Ed. 517.

The sales in the southern two thirds of the state, the so-called Indianapolis territory, are, at least in part, on a different footing. As to the non-house account sales in this sector of Indiana we hold the trial court's conclusions of law were in every respect correct.

Certainly appellant performed local business activities and provided local services. Through the Indianapolis office customers in the southern zone were given information on new products, assistance with engineering applications, lessons in product installation, follow-up assistance on certain orders, and generally a source of communication. Appellant denominates the employees at Indianapolis as *salesmen* and acknowledges that their efforts were directed at producing sales.

While it is true that orders were often mailed to out of state offices for acceptance we do not find this, in the context of the totality of appellant's sales system, to be persuasive in demonstrating a requirement that we acknowledge the sales as interstate in character. On the contrary, we would regard such conduct, *if* done for "tax reasons", as being, in light of such business activity within the state, a subterfuge designed to avoid the valid and constitutionally proper imposition of a rightful and reasonable tax. We look to the totality of appellant's activity in the southern section and not to any isolated portions of it which, if considered alone, might lead to a cursory conclusion that the acts are interstate in character. It is the

". . . bundle of corporate activity . . ." *General Motors Corp.* v. *Washington, supra,* 377 U. S. at 447; 12 L. Ed. 2d at 439.

which we examine. Viewed from this perspective we regard it as apparent that, as to southern zone sales, any interstate activity was indeed only incidental to Mueller's intrastate activity.

Clearly a "nexus" with the state has been established with regard to non-house account sales in the southern territory. *General Motors Corp.* v. *Washington, supra.* We do not regard it unreasonable, in light of Mueller's business contacts with Indiana, that appellant be called upon to pay its proportionate share of tax responsibility under the Gross Income Tax.

Appellant has argued in its brief that the southern sales are exposed to the unconstitutional risk of multiple taxation by the tax. The burden of demonstrating that such is the case falls upon one challenging a state tax. *General Motors Corp.* v. *Washington, supra; Norton Co.* v. *Department of Revenue, supra.* Appellant has not met this burden. It has introduced no evidence that multiple taxation exists nor has it demonstrated that it is possible.

Appellant cites *J. D. Adams Mfg. Co.* v. *Storen* (1938), 304 U. S. 307, 82 L. Ed. 1365, as authority for its contention that a multiple tax burden may not be imposed on interstate commerce. It is certainly valid authority for that point. In that case the United States Supreme Court held that Indiana's Gross Income Tax could not be applied to sales made to out-of-state customers who mailed their orders direct to Indiana for acceptance here. The goods purchased were sent from Indiana through interstate commerce to the customer. A tax on the sale of goods made in Indiana, under orders accepted in Indiana, to customers outside the state, was held to be improper as creating a burden of double taxation. The risk of a double tax burden arose because all sales were taxed by Indiana, both those in the state and those outside it. The United States Supreme Court wisely pointed out that the state where the sales were made could also tax them. This would clearly burden commerce. But, that court noted that a

". . . tax on the privilege of manufacturing, measured by the value of the goods manufactured, or by other permissible forms of levy . . ." 304 U. S. at 313-314, 82 L. Ed. at 1370-1371.

would be allowable. This approach would have apportioned the tax by applying it to the incidents of contact each state had with the manufacturer-seller-taxpayer. Applying this reasoning to the case at hand we see no abrogation of constitutional mandates. Indiana has taxed that activity which occurred here in regard to the non-house account transactions which were made in the southern territory—the sales. By the authority of a case appellant cites in its brief, *J. D. Adams Mfg. Co.* v. *Storen, supra,* our sister states could not tax this Indiana activity. While the state of manufacture might place a tax on the privilege of manufacturing, it could not tax the act of sale in Indiana. *J .D. Adams Mfg. Co.* v. *Storen, supra.* This being the case, the Indiana Gross Income Tax, as applied to Mueller, is apportioned in accordance with the activity conducted by the appellant in its manufacturing and merchandising pursuits.

We hold that the State of Indiana, as to these sales,

> ". . . has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded." *General Motors Corp.* v. *Washington, supra,* 377 U. S. at 441, 12 L. Ed. 2d at 435.

The house account in the southern sector demands a different treatment than the other sales there. These sales, the evidence shows, were the product of Mueller's home office in Michigan. While it is the case that appellant's Indiana-based personnel may have serviced the account on occasion and were provided with records of sales to it;

> "There does not exist a sufficient nexus between the tax and [taxpayer's] business transactions within Indiana, for which the tax is an exaction, to justify levying the tax on the income from sales to . . ." *Gross Income Tax Div.* v. *Owens-Corning Fiberglas Corp.* (1969), 253 Ind. 102, at 118, 251 N. E. 2d 818, at 827.

the house account.

This is not to say that under all circumstances that an account denominated a "house account" by a foreign corpo-

ration would not be subject to the tax here in question. The nature of the contact between the state and the account determines the tax status of sales to it and not constitutionally appropriate appellations that may be attached to it.

The house account here in question was, the evidence shows, the direct result of negotiations between appellant's home office personnel and the account with all communication by the customer made direct to Port Huron, Michigan. While Indianapolis personnel serviced the account it was done so seldom as to be insignificant and, furthermore, was done on a special request basis at the insistence of a division of the home office. Therefore, the Indiana Gross Income Tax should not have been applied to receipts derived from these sales.

In summary then, appellant's sales should have been treated by the taxing authorities as follows:

*Northern Indiana*
Standard Products—exempt;
Industrial Products—exempt;

*Southern Indiana*
Standard Products—subject to the tax;
Industrial Products—subject to the tax;

*House Accounts*—exempt.

For all the foregoing reasons the judgment is affirmed in part and reversed in part in the manner summarized immediately above.

Therefore, the cause is remanded to the trial court with directions to vacate the judgment appealed from and to enter judgment for the plaintiff in an amount to be computed upon the *Southern Indiana Standard and Industrial Accounts* all as indicated hereinabove.

Judgment affirmed as to *Southern Indiana accounts.*

Judgment reversed as to the *Northern Indiana accounts* and as to all *House accounts.*

Arterburn, C.J., DeBruler, Givan and Prentice, JJ., concur.

NOTE.—Reported in 265 N. E. 2d 704.