REYNOLDS METALS COMPANY,
Plaintiff-Appellant,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, GROSS INCOME TAX
DIVISION, Defendant-Appellee.

No. 1–779A201.

Court of Appeals of Indiana,
First District.

March 16, 1982.
Rehearing Denied April 21, 1982.

2

Richard E. Deer, Larry J. Stroble, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for plaintiff-appellant.

Linley E. Pearson, Atty. Gen., Herbert L. Allison, Ted J. Holaday, Deputy Attys. Gen., Indianapolis, for appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

This is an appeal by the plaintiff-appellant Reynolds Metals Company (Reynolds) from an adverse decision by the Johnson Circuit Court in its suit for refund of gross income taxes paid under protest to the defendant-appellee Indiana Department of State Revenue, Gross Income Tax Division (Department) for the audit period encompassing the years 1969, 1970, 1971, and 1972. Reynolds had reported $34,965,212 as gross income subject to taxation, and paid $174,826 in taxes thereon. Thereafter, following an audit, the Department assessed Reynolds an additional tax of $404,305, including interest. Reynolds filed a protest, and, after hearing thereon, an amended additional assessment was issued by the Department for $302,180 in taxes, $86,970 in interest, and $30,218 in penalties, or a total additional assessment of $419,368. Reynolds paid that amount, and upon the Department's denial of the claim for refund, filed this suit. At issue is the Department's contention that $95,401,228 of gross income is subject to tax. Reynolds claims that only $33,371,919 is taxable. The dispute concerns primarily the manner in which the interstate commerce exemption from gross income, authorized by Ind. Code 6–2–1–7(a),[1] is to be determined.

## STATEMENT OF THE FACTS

Reynolds, a Delaware Corporation with its principal office in Richmond, Virginia, is a primary producer of aluminum, and its business includes the mining of bauxite, the production of aluminum ingot, and the fabrication of semi-raw products, aluminum sheet, plate, wire, rod, bar, and extruded material. Reynolds has plants and business facilities throughout the United States and in various foreign countries and is organized along divisional lines as follows:

1. Packaging Division: This division manufactures and sells material used by manufacturers for packaging, such as cartons, pouches, cans, and plastics. It has one sales office in Indianapolis, Indiana, and had Indiana destination sales of $11,744,369 during the audit period. This division has no warehouse, factory, or fabricating plant in Indiana. Reynolds claims that only $1,552,207 of the receipts is taxable; the Department claims $11,288,497 is taxable. Herein are included two house accounts, Pretty Pak and Chitwood Paper, over which a dispute exists involving a $167,622 mathematical error.

2. Mill Products Division: This division produces and sells industrial products such as foundry ingot, sheet and plate, extruded material, insulated wire, and rod and bar stock. Though no foundries or manufacturing plants exist in Indiana, this division has sales offices in Ft. Wayne, South Bend, and Indianapolis and employs a total of five salesmen. The Ft. Wayne and South Bend offices are under the control of the Chicago district sales office, and the Indianapolis office is under the control of the Louisville district sales office. Mill Products is by far the largest producer of income, accounting for about 60 percent of Reynolds' total sales. Reynolds' Indiana destination sales for this division during the audit period were $77,243,898. Reynolds claims that only $29,267,422 should be taxable while the Department claims $70,987,093 is taxable.

3. Architectural and Building Products Division: This division produces aluminum products used in the construction industry, such as roofing, siding, windows, and doors. It maintains a sales office and warehouse in Indianapolis which employ four to five

---

1. This Chapter, Ind. Code 6–2–1–1 through Ind. Code 6–2–1–53, concerning gross income taxes and sales and use taxes, has been repealed. Acts 1973, P.L. 47, § 9, Acts 1980, P.L. 52, § 2, Acts 1980, P.L. 61, § 15 and Acts 1981, P.L. 77, § 22. References are made throughout this opinion to sections that were in effect at the time this action arose, but were since repealed. For present law on gross income taxation, see Ind. Code 6–2.1–1–1 through Ind. Code 6–2.1–8–10.

salesmen, warehousemen, and truck drivers to sell to and service contractors. During the audit period it had total Indiana destination sales of $4,521,593, all of which the Department claims is taxable. Reynolds claims that only $2,350,950 is taxable.

4. Transhelter Division: This division produces roofing, siding, and paneling for mobile homes in its manufacturing plant in Bourbon, Indiana. Reynolds concedes that all of its $1,204,231 in gross receipts is taxable.

5. Consumer Division: This division sells products, particularly Reynolds Wrap, an aluminum foil, to distributors for retail. While this division has no sales offices, plants, or warehouses located in Indiana, it employs salesmen who work out of their homes. There are three salesmen in Indianapolis, one in Ft. Wayne, and one in Evansville. This division had Indiana destination sales during the audit period totaling $7,515,907, of which the Department claims $5,792,989 is taxable. Reynolds claims all should be exempt.

6. Electrical Division: This division produces insulated wire and cable for use as an electrical conductor, principally the type used by utilities in construction of high voltage transmission lines. This division had no sales offices, plants, or salesmen based in Indiana during the audit period. It had Indiana destination sales during the audit period of $1,626,836, all of which Reynolds claims are exempt. The Department claims $107,814 is taxable.

7. Alumina/Chemicals Division: This division produces oxide of aluminum and bauxite useful in filters, abrasives, and paper whitening, and has no Indiana sales offices, plants, or salesmen based in Indiana. The Indiana destination sales during the audit period totalled $444,690, all of which Reynolds claims is exempt, while the Department claims $90,384 is taxable.

8. Reynolds Aluminum Supply Company ("RASCO"): This division is a sales organization for the mill products division and the architectural division. It has no plant, warehouse, sales offices, or salesmen in Indiana. During the audit period it had total Indiana destination sales of $2,039,547, all which Reynolds claims is exempt; the Department claims all is taxable.

9. Foreign: This division had Indiana destination sales totaling $583,472, of which the Department claims $538,317 is taxable; Reynolds claims all is exempt.

10. Henderson Farms: This is a customer, and not a division, and is not located in Indiana, but Kentucky. Sales credited to this account total $59,619, all of which Reynolds claims is exempt, while the Department claims $12,118 is taxable.

Each division maintained a separate sales organization, but the activities of all Reynolds Indiana-based salesmen, regardless of division, were very similar. The sales offices and salesmen had telephones, credit cards, company cars, brief cases, and expense reimbursement, all furnished by Reynolds. Equipped with catalogs, samples, and sales information, they called upon customers regularly, new and old, solicited new accounts, and serviced old ones. They expedited shipments, heard complaints, adjusted claims, and assisted customers in preparing orders. Generally, the northern Indiana sales forces reported to the Chicago district office, and those in southern Indiana reported to the Louisville district office. Salesmen were in regular contact with the respective district offices by means of teletype, telephone, or letter. They assisted, occasionally, in establishing a customer's credit, and even assisted in collecting overdue accounts. They solicited and received aid, including technical assistance, from the district offices and from the regional level. They did not, however, approve credit, accept or write orders, or bill or receive payment, as these were functions of district or regional offices or the individual manufacturing plant itself. Numerous instances existed in the total sales organization where Indiana customers were serviced totally from outside of Indiana, even at the executive level. These latter so-called "house accounts" were negotiated between top-level Reynolds executives and executives of large companies operating nationwide. These accounts were serviced totally from

without Indiana, and the products were shipped to the Indiana customers directly, by-passing existing local sales forces or facilities. Further, some salesmen had territories that transcended state lines.

Reynolds prepared the sections of its Indiana tax returns for the audit period relative to the interstate commerce exemptions at issue in accordance with a three-factor apportionment formula authorized by Ind. Code 6–3–2–2(b) of the Adjusted Gross Income Tax Act.[2] That apportionment formula is not expressly authorized in the Gross Income Tax Act, Ind. Code 6–3–2–1 *et seq.* The formula was suggested for possible application in gross income taxation in *Indiana Department of Revenue, Gross Income Tax Division v. P. F. Goodrich Corp.*, (1973) 260 Ind. 41, 292 N.E.2d 247. That case involved the extent to which the proceeds of an out-of-state sale of a corporate asset were to be considered as taxable gross income to the Indiana corporate taxpayer. The three-factor apportionment formula utilized by Reynolds to compute its exemption considers Reynolds' in-state and out-of-state property, payroll, and sales. Utilizing computerized data amassed at its computer center in Richmond, Reynolds' total world-wide property was compared to Reynolds' Indiana property, and a percentage ascertained; Reynolds total world-wide sales were compared to Indiana destination sales and a percentage ascertained; likewise Reynolds' total payroll everywhere was compared to Reynolds' Indiana-based payroll and a percentage ascertained. The average of these three percentages was arrived at by totaling them and dividing by three to arrive at an apportionment factor. Reynolds then applied this factor to its Indiana sales to determine the amount of its taxable gross income. Reynolds did not undertake to associate and identify the actual activities in Indiana that produced the income, or identify the activities that should be exempt. The Department refused to accept the three-factor apportionment formula to determine interstate commerce exemptions, but demanded that Reynolds demonstrate the origin of the commercial transactions and activities within and without the state so that particular transactions or classes of transactions could be assessed individually to determine whether they qualified for the interstate exemption or were taxable.

Frank Brooks, the auditor who conducted the field audit, testified that he encountered difficulties immediately when he examined the computer printouts to verify the interstate commerce exemption claimed by Reynolds. The initial tapes, designed to accumulate and store sales tax data, did not reveal origin, destination of sales, or customers. Additional tapes were produced by John Detweiler, Reynolds' tax accountant, which were identified as GS 327, and runs on those tapes produced further information. These tapes were prepared from invoices for the purpose of providing sales analyses, market analyses, individual sales statistics, and credits. These tapes disclosed names and addresses of customers, where goods were sold, where shipped, where shipped from, sales region and district, pounds of products sold, their dollar value, and salesman name and location. Additionally, work papers were consulted. From the additional data, adjustments were made in the original deficiency assessment. Information from those sources provided the basis of calculations of sales by the divisions related above. Reynolds' manner of accounting on the computer did not seem to be adequate to develop more thorough classification and description of Indiana activity. The Department and the trial court refused to accept the apportionment formu-

---

**2.** Ind. Code 6–3–2–2(b) states:

"If the business income derived from sources within the state of Indiana of a corporation or nonresident person cannot be separated from the business income of such person or corporation derived from sources without the state of Indiana, then the business income derived from sources within this state shall be determined by multiplying the business income derived from sources both within and without the state of Indiana by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three [3]."

la approach to the determination of the interstate commerce exemption and further refused to grant the interstate commerce exemption solely on the basis that sales credit was given to an out-of-state sales office. The Department contends that to carry the burden of proof, Reynolds must disclose a description of the activities generating the sales.

### ISSUES

Reynolds presents for review the following issues:

I. Whether the trial court's decision is contrary to law and to the evidence in failing to require the Department to apportion Reynolds' gross income in proportion to the in-state activities necessary to generate that income as required by the Due Process Clause and Commerce Clause of the United States Constitution;

II. Whether the trial court's decision is contrary to the law, to the evidence, and to the stipulations at trial in failing to correct certain mathematical errors contained in the Department's final assessment of tax;

III. Whether the trial court's Finding of Fact 2.24 is contrary to the law and to the evidence in that 60 percent of the orders to Whirlpool Corporation in Evansville, Indiana, were filled from an Evansville public warehouse rather than 60 percent of the orders placed by all Reynolds' Indiana customers;

IV. Whether the trial court's conclusion that Reynolds failed to "identify and segregate" its gross receipts was contrary to law, to the evidence, and to the stipulated evidence;

V. Whether the trial court erred in taxing sales made from locations outside Indiana by sales personnel based in other states in violation of the Due Process Clause and Commerce Clause of the United States Constitution and Ind. Code 6–2–1–2;

VI. Whether the trial court erroneously failed to order a refund of gross income taxes collected on certain house accounts which were admittedly exempted by the Department;

VII. Whether the trial court erred in permitting taxation of sales to Chrysler Corporation which were negotiated, consummated, and served by Reynolds' personnel having no Indiana connection in violation of the Commerce Clause and Due Process Clause of the United States Constitution and Ind. Code 6–2–1–2;

VIII. Whether the trial court's decision was contrary to the law and to the evidence in permitting taxation of Reynolds' house account sales to consignment distributors in violation of the Commerce Clause and Due Process Clause of the United Constitution and Ind. Code 6–2–1–2; and

IX. Whether the trial court erred in permitting taxation of direct sales to general line distributors outside the context of any consignment arrangement in violation of the Commerce Clause and Due Process Clause of the United States Constitution and Ind. Code 6–2–1–2.

### DISCUSSION AND DECISION

*Issue I. Apportionment*

Reynolds contends that the court erred in refusing to apportion its gross income in accordance with the three-factor apportionment formula found in Ind. Code 6–3–2–2, and suggested in *Goodrich, supra.* Reynolds asserts that the court, in requiring the exemptions to be determined by associating and identifying the income with the business activities and operations which generated the gross income, imposes a tax completely disporportionate to those activities,

and subjects it to the risk of multiple taxation. It argues that such tax assessment unduly burdens interstate commerce and is in violation of Article I, sec. 8, cl. 3 (Commerce Clause) and the Fourteenth Amendment, Sec. 1 (Due Process Clause) of the United States Constitution. Reynolds insists that *Goodrich* mandates the Department, and the court, to apply the three-factor formula, consisting of the property factor, the payroll factor, and the sales factor, to arrive at a ratio between its Indiana sales and its world-wide sales. The result would effectively decrease the Indiana taxable income from $95,401,229 to $38,330,393 for the audit period. The trial court held in Conclusion of Law 3.11 that the Department must apportion Reynolds' gross income tax upon the income realized through its Indiana activities. However, it held, in Conclusion of Law 3.14, that the Department was not obligated to apply the three-factor apportionment formula of Ind. Code 6–3–2–2 when the means to associate and identify the income existed, but was not used.

■ To form a backdrop to Reynolds' argument, we note that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that there exist a definite link, a certain degree of contact or nexus, between the state and the person, property or transaction sought to be taxed. *Goodrich, supra.* Clearly, Reynolds' presence in Indiana for this purpose is established by its numerous sales offices and salesmen, warehouse facilities with the attendant employees, property, manufacturing plant, and sales in the audit period in excess of $100,000,000. *Goodrich, supra; Mueller Brass Co. v. Gross Income Tax Div.,* (1971) 255 Ind. 514, 265 N.E.2d 704; *Indiana Department of Revenue, Gross Income Tax Division v. Surface Combustion Corporation,* (1953) 232 Ind. 100, 111 N.E.2d 50, cert. denied 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353; *See also, Northwestern States Portland Cement Co. v. Minnesota,* (1959) 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421. The question of sufficient contacts between Reynolds and the State generally is not, however, questioned.

It is well settled that even interstate commerce must bear its just share of the state tax burden. *General Motors Corp. v. Washington,* (1964) 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430; *Goodrich, supra.* The question then becomes, particularly in the area of gross income taxation, whether "what the state is exacting is a constitutionally fair demand by the state for that aspect of the interstate commerce to which that state bears a special relation." *Central Greyhound Lines, Inc. v. Mealey,* (1948) 334 U.S. 653, 661, 68 S.Ct. 1260, 1265, 92 L.Ed. 1633; *Goodrich, supra.* Courts have repeatedly upheld state income taxes that have been properly apportioned to a taxpayer's local activities with a state. *General Motors, supra; Northwestern States Portland Cement Co., supra; Colonial Pipeline v. Traigle, Collector of Revenue of Louisiana,* (1975) 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1. The unapportioned taxes are forbidden because such a tax is capable of being levied by every state that the commerce touches and would thus create a cumulative burden not imposed upon the local commerce and would spell destruction upon interstate commerce. It would revive the barriers to interstate trade that it was the object of the Commerce Clause to remove. *Western Live Stock v. Bureau of Revenue,* (1938) 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823. To meet this proscription, legislatures have passed statutes creating apportionment formulas not dissimilar to Ind. Code 6–3–2–2, and these have been held by the Supreme Court of the United States not to violate the Commerce Clause. *Northwestern States Portland Cement Co., supra; International Harvester v. Evatt, Tax Commissioner,* (1947) 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. 390; *Moorman Manufacturing Co. v. Bair, Director of Revenue of Iowa,* (1978) 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197.

Reynolds relies upon *Goodrich* as *requiring* the three-factor formula apportionment in lieu of identifying the actual income generated by business activity in this state. We disagree. In *Goodrich,* an Indiana corporation owned stock in a Delaware corpo-

ration. Upon dissolution of the latter corporation, accomplished beyond the borders of Indiana, Goodrich received income from the sale of its stock. Our Supreme Court held that gross income tax could be assessed against those proceeds if apportioned in relation to Goodrich's activities in Indiana. The court held that Goodrich's domicile in Indiana, and its doing business here, constituted a sufficient nexus to justify the imposition of the tax. The court, in a footnote,[3] suggested the three-factor formula contained in Ind. Code 6–3–2–2 as a possible approach. We note that this was a one-instance transaction which was incapable of division, as all of the transactions concerning the sale occurred beyond the border of the state, and no means existed to apportion the receipts on the basis of local activity. We further note that the court did not require *all* of Goodrich's income, including that derived from sales, to be so apportioned; only the stock transaction was at issue.

The tax imposed against Reynolds here is pursuant to the Gross Income Tax Act of 1933, as amended. Ind. Code 6–2–1–1 *et seq.* Such tax is levied upon the receipt of the entire gross income of corporations resident and/or domiciled in the State of Indiana, and "upon the receipt of gross income derived from activities or businesses or any other source within the state of Indiana, of all persons [corporations] who are not residents of Indiana. . . ." Ind. Code 6–2–1–2. Exempt from such tax is the gross income derived from interstate commerce, "but only to the extent to which the State of Indiana is prohibited from taxing such gross income by the constitution of the United States of America." Ind. Code 6–2–1–7(a). The following cases appear to approve a tax that was assessed upon the actual activity of the corporation in the state without reference to a formulaic determination of the ratio between local and business activities. *Mueller Brass Co. v. Gross Income Tax Div.*, (1971) 255 Ind. 514, 265 N.E.2d 704; *Gross Income Tax Div., v. Owens-Corning Fiberglas Corp.*, (1969) 253

Ind. 102, 251 N.E.2d 818. *See also, National Geographic Society v. California Board of Equalization*, (1977) 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631; *Standard Pressed Steel Co. v. Washington*, (1975) 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719; *Indiana Department of Revenue, Gross Income Tax Division v. Beemer Enterprises, Inc.*, (1979) Ind.App., 386 N.E.2d 187; *Gross Income Tax Division, State of Indiana v. Fort Pitt Bridge Works*, (1949) 227 Ind. 538, 86 N.E.2d 685.

Turning to Ind. Code 6–3–2–2, which Reynolds claims is controlling, we find that it is part of the *Adjusted* Gross Income Tax Act of 1963. Subsection (b) thereof provides that:

"If the business income derived from sources within the state of Indiana of a corporation or nonresident person *cannot* be separated from the business income of such person or corporation derived from sources without the state of Indiana, then the business income derived from sources within this state shall be determined by multiplying the business income derived from sources both within and without the state of Indiana by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three." (Emphasis added.)

■ This apportionment statute clearly applies *only* if the in-state and out-of-state income *cannot* be separated, as in *Goodrich*, where the transaction was a one-instance sale, conducted out of state. The Supreme Court of the United States in construing the Commerce Clause will permit only a portion of such transaction to be taxed and no more. *Goodrich* and Ind. Code 6–3–2–2 apply only where such inseparability exists. Indiana, by Ind. Code 6–2–1–5, requires a segregation of income taxable at different rates. The party claiming an interstate commerce exemption, or the danger that he is subject to the risk of multiple taxation, bears the burden of establishing such facts, and any doubt should be resolved in favor of the tax. *Storen v. Jasper County Farm*

**3.** 260 Ind. at 48, n.1, 292 N.E.2d 247.

*Bureau Co-operative Association, Inc.,* (1936) 103 Ind.App. 77, 2 N.E.2d 432; *Norton Company v. Department of Revenue of Illinois,* (1951) 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517; *Mueller Brass Co., supra; Owens-Corning, supra.*

■ We conclude from the foregoing that a corporation must segregate its accounts and keep sufficient records so that intrastate and interstate activities producing income can be sufficiently identified and interpreted to intelligently assess the interstate commerce exemption without resort to an arbitrary formula not provided in the Gross Income Tax statute of 1933. The *Goodrich* rationale is not apposite here because there is no showing that Reynolds' Indiana activities do not admit to a division or segregation. Failure to identify and segregate its records will result in adverse tax consequences to the corporation.

■ From an overview of this problem we are compelled to observe an inherently erroneous aspect of Reynolds' argument. A total adherence to the three-factor formula approach could permit a company such as Reynolds, though conducting all of the instate activities relative to Indiana sales, such as mining, smelting, manufacturing, and sales by Indiana based salesmen to Indiana customers within the borders of Indiana, to pay tax on only a portion of its receipts gained thereby because those receipts were only a percentage of world-wide sales. This could result in a tax wildly disproportionate to its substantial Indiana activity. Ind. Code 6–2–1–2 levies a tax upon foreign corporations for "the receipt of gross income from activities or business of any other source within the state. . . ." We are unpersuaded that a three-factor formula was intended either by the statute or our Supreme Court, except in the type of limited factual situation arising in *Goodrich.*

*Issue II. Erroneous computation of tax because of the inclusion of matters previously agreed as exempt*

■ At trial a stipulation, denominated plaintiff's exhibit No. 1, and signed by Richard E. Deer, attorney for Reynolds, and Ted J. Holaday, Deputy Attorney General for Indiana, and Frank A. Klinkose, Jr., Administrator for the Income Tax Division of the Department of State Revenue, was admitted into evidence. Contained in this lengthy written stipulation was specification 11, which reads as follows:

"11. The gross receipts of Reynolds, the exemptions allowed by the department . . . the additional adjustments in gross receipts requested by Reynolds under Count II and the taxable gross receipts for Reynolds under Count II, are attached hereto and made part hereof in Exhibit F."

Exhibit F contains the following information relevant to Indiana operations here.

| Division | Gross Receipts of Reynolds | Exemptions Allowed per Supplemental Audit of Department |
|---|---|---|
| Consumer | $ 7,515,907 | $1,722,918 |
| Electrical | 1,626,836 | 1,734,650 |
| Alumina | 444,690 | 354,306 |
| Machinery | 266,348 | 229,092 |
| Henderson Farms | 59,619 | 47,501 |
| Foreign | 583,472 | 45,155 |
| | $10,496,872 | $4,133,622 |

However, Klinkose, agent for the Department, testified on cross-examination that in his capacity as Administrator he had determined that the sales by those divisions were wholly exempt. The conflict between the stipulation and his testimony was not clarified, explained, or pursued. Reynolds seems to argue that by Exhibit F the parties stipulated that the entire gross receipts for those divisions were exempt, and the State was bound by that stipulation. However, the record discloses that three audits were conducted, consisting of the field audit, a desk (supplemental) audit, and a pretrial discovery audit. It appears that the testimony of Klinkose may have had reference to the field audit, which was changed by later determinations.

The stipulation commences with the following expression, "It is hereby stipulated by the plaintiff and defendant in this action . . . that the following statements are true

and may be accepted as facts ...." As stated in *Bruggner v. Shaffer*, (1965) 138 Ind.App. 183, 187, 210 N.E.2d 439,

> "It is an accepted rule of law in this state that facts which are stipulated between the parties, and not having been set aside or withdrawn are conclusive upon the parties and the tribunal."

*See also Indiana Department of State Revenue, Gross Income Tax Division v. Hoosier Metal Fabricators, Inc.*, (1979) Ind.App., 386 N.E.2d 963; *State Department of Revenue v. American Motorists' Insurance Company*, (1979) Ind.App., 396 N.E.2d 907. A stipulation must be fairly and liberally construed and should be interpreted in light of the whole record. *City of Cannelton v. Lewis*, (1952) 123 Ind.App. 473, 111 N.E.2d 899.

We are of the opinion that the plain meaning of the stipulation indicates that the parties had agreed at trial time that those divisions had not been totally exempt by the State in its administrative audits, but had been exempt only to the total extent of $4,133,622, and the trial court did not err in so construing it in spite of the unexplained testimony of Klinkose.

Regardless of this stipulation, the testimony of Klinkose, and the correction of the exemptions after the supplemental audit, taxes were reduced to $302,180, and auditor Brooks testified that among other adjustments made to reach that adjustment Electrical, Consumer, Chemical, Alumina, Machinery, Foreign, and Henderson Farms were all removed, and so there is no prejudicial error. The $302,180 was paid with penalty and interest and the suit is to recover that amount.

*Issue III. Whirlpool account*

The trial court's Finding of Fact 2.24 states that Reynolds' Mill Products Division maintained inventories in Evansville public warehouses and "sold, filled and shipped approximately 60 percent of the orders placed by its Indiana customers from the Evansville source." Reynolds correctly points out that only 60 percent of the orders to Whirlpool Corporation in Evansville, and not all Indiana customers, were filled from that source. The Department concedes the

trial court erred in this regard, but argues that Reynolds suffered no prejudice thereby, since all of the sales from the warehouse were reported taxable and those receipts are not in issue. Reynolds does not contend a specific prejudice, except to argue that the erroneous finding cannot serve as a basis for the trial court's decision taxing the Mill Products Division sales for which Reynolds sought exemption. We agree, and such error will not be applied to all Indiana sales to determine their taxability.

*Issue IV. Failure to identify and segregate;*

*Issue V. Taxation of sales made by out-of-state based sales personnel*

Both these issues bear upon the question of the identification of the in-state activity and out-of-state activity that generated the Indiana destination sales and will be discussed together. The trial court, in Findings of Fact 2.15 and 2.16, and Conclusions of Law 3.9, 3.10, and 3.12, stated that Reynolds, in order to obtain certain interstate commerce exemptions from gross income tax under Ind. Code 6–2–1–7(a), had the burden of proving that such income qualified for the exemption. The trial court found that Reynolds failed to identify its business operations and activities during the audit period by each of its sales divisions with the product of these sales divisions. We understand the court's ruling to be that Reynolds did not meet its burden of proof. The court's Conclusion of Law 3.12 reads as follows:

> "What portion of Reynolds' gross income or receipts is subject to gross income tax is not determined by what sales representative got credit for the sales which produced the income or receipts, but by determination of the scope, the nature and extent of all of the business activities and operations of Reynolds, in Indiana, including fabricating, smelting, manufacturing, warehousing, servicing as well as sales, and the relationship which these income producing activities and business operations bear to the opportunities and advantages extended by Indiana to Reyn-

olds which enabled Reynolds to engage in those activities and operations."

Reynolds argues that the trial court erred in failing to make separate findings and conclusions that each transaction or category of transactions had the required nexus or contact with Indiana to be subject to the tax. Reynolds demonstrates that it segregated its gross receipts for each of its divisions, Packaging, Mill Products, Architectural, Transhelter, Consumer, Electrical, Alumina, RASCO, Foreign, and Henderson Farms. It shows that the gross income is further separated as to issue, region, district, state, name and location of sales representative who was credited for the sale, name and address of customer, who sold to, where shipped to, pounds of product sold, and its dollar value. In essence Reynolds claims this is sufficient segregation.

We first note that the sole purpose of the audit, and the sole issue in this case, is the determination of the interstate commerce exemption for Reynolds' Indiana destination sales, and the heart of that determination is the identification and description of transactions and classes of transactions and activities that have insufficient contact with Indiana to support the imposition of the tax. Reynolds supports much of its claim to the interstate commerce exemption only with proof that the sales credit was given to an out-of-state sales office. The Department contends, and the trial court so held, that sales credit is not in and of itself determinative.

Reynolds contends and the Department agrees that it is proper to determine taxability on the basis of separate and different transactions or separate and different categories of the taxpayer's transactions, and if a separate or different category of transactions lacks the sufficient nexus with the taxing state, then that separate and different transaction or category may not be taxed, even though other transactions or categories of the taxpayer could be taxed. *Norton Company, supra; Mueller Brass, supra; Owens-Corning, supra.*

*Mueller Brass* is illustrative of the problem posed here. The taxpayer, a Michigan corporation, manufactured products there and sold them in Indiana through a sales office and warehouse in Indianapolis which serviced the southern two-thirds of the state. However, the northern one-third of the state, and certain house accounts in the southern district, were handled and serviced by the Michigan home office, and were in no way related to the activities of the Indianapolis office. Orders and payments were sent by Indiana customers directly to the Michigan office and the products were shipped directly to the customer. Our Supreme Court, following *Norton Company, supra,* affirmed the imposition of gross income tax on the southern district transactions, except the house accounts, but rejected taxation on the northern district sales. The court stated:

"While it is true that orders [southern district] were often mailed to out of state offices for acceptance we do not find this, in the context of the totality of appellant's sales system, to be persuasive in demonstrating a requirement that we acknowledge the sales as interstate in character. On the contrary, we would regard such conduct, *if* done for 'tax reasons', as being, in light of such business activity within the state, a subterfuge designed to avoid the valid and constitutionally proper imposition of a rightful and reasonable tax. We look to the totality of appellant's activity in the southern section and not to any isolated portions of it which, if considered alone, might lead to a cursory conclusion that the acts are interstate in character. It is the

'. . . bundle of corporate activity . . .' *General Motors Corp. v. Washington* [ (1964) 377 U.S. 436, 437, 84 S.Ct. 1564, 1566, 12 L.Ed.2d 430], which we examine. Viewed from this perspective we regard it as apparent that, as to southern zone sales, any interstate activity was indeed only incidental to Mueller's intrastate activity.

Clearly a 'nexus' with the state has been established with regard to non-house account sales in the southern ter-

ritory. *General Motors Corp. v. Washington, supra.*"

255 Ind. at 536–37, 265 N.E.2d 704.

The court held that the house accounts in the southern district demanded a different treatment, however.

"These sales, the evidence shows, were the product of Mueller's home office in Michigan. While it is the case that appellant's Indiana-based personnel may have serviced the account on occasion and were provided with records of sales to it;

'There does not exist a sufficient nexus between the tax and [taxpayer's] business transactions within Indiana, for which the tax is an exaction, to justify levying the tax on the income . . .' *Gross Income Tax Div. v. Owens-Corning Fiberglas Corp.*, (1969) 253 Ind. 102, at 118, 251 N.E.2d 818, at 827."

255 Ind. at 538, 265 N.E.2d 704. The court concluded a similar lack of nexus existed regarding the house account and held the sales in the northern district were exempt even though there were certain Indiana-based contacts. The incidence of importance in the sales process did not constitute that quantum of contacts necessary to render the sales "Indiana sales."

"The evidence shows that such sales were initiated by personnel residing outside the state, that the goods were shipped into Indiana from another state, that the orders that were not given directly to the salesmen were mailed to appellant's out-of-state offices, and that the orders were accepted and payment received at offices located outside of Indiana. Such sales clearly fall outside the realm of the Indiana Gross Income Tax. *Norton Co. v. Department of Rev. of the State of Illinois* (1951), 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517."

255 Ind. at 535–36, 265 N.E.2d 704. The court describing the status of "house accounts" stated:

"This is not to say that under all circumstances that an account denominated a 'house account' by a foreign corporation would not be subject to the tax here in question. The nature of the contact between the state and the account determines the tax status of sales to it and not constitutionally appropriate appellations that may be attached to it."

255 Ind. at 538–39, 265 N.E.2d 704.

In *Owens-Corning, supra,* the court stated that in determining whether the gross receipts sought to be taxed are fairly related to the taxpayers activities within the state,

"[W]e are guided by the substantial and extensive activities of appellee's sales representatives who resided in the state and who worked out of offices located in Indiana. We recognize that the actual consummation of the sales contracts did not take place in Indiana. *However, when faced, as here, with substantial intrastate activities, the mere mechanical process of order entry is not controlling.*" (Emphasis added.)

253 Ind. at 113, 251 N.E.2d 818. *Owens-Corning,* however, exempted, as did *Mueller,* certain house accounts negotiated and serviced by home offices at executive level, and not through the field sales force.

However, the burden of proving interstate commerce exemption rests upon Reynolds, *Mueller Brass, supra; Storey, supra,* and the burden of proving exposure to multiple taxation is upon the party asserting it. *Mueller Brass, supra. Owens-Corning,* quoting *Norton Company,* stated:

"This burden is never met merely by showing a fair difference of opinion which as an original matter might be decided differently. The corporation, by submitting itself to the taxing power of Illinois, likewise submitted itself to its judicial power to construe and apply its taxing statute insofar as it keeps within constitutional bounds."

253 Ind. at 113, 251 N.E.2d 818.

■ *Owens-Corning* is authority for the proposition that where the soliciting and order-servicing is done almost entirely by a taxpayer's sales personnel and officers out of state, with minimum in-state contacts, the receipts are exempt as being interstate in character. Mere solicitation of orders

with a state does not form a sufficient nexus to impose a tax on the business generated by the solicitation. Under Ind. Code 6-2-1-2, gross income of a nonresident must be derived from activities within the state. The mere fact that income may have been received from persons located within the state is not enough, and there must be more than minimal or incidental contact. *Indiana Department of State Revenue v. Convenient Industries of America, Inc.,* (1973) 157 Ind.App. 179, 299 N.E.2d 641.

■ Reynolds argues that the evidence shows that a large portion of its gross receipts taxed by the Department was derived from Reynolds' salesmen based outside Indiana. However, our examination of the record leads us to the same conclusion reached by the trial court. Reynolds has not met its burden of proving its interstate commerce exemption. Other than areas specifically addressed in this opinion, Reynolds has presented a computer printout that reflects only that the sales were credited to out-of-state based sales representatives. The printout does not tell us more than that. On the contrary, in the Chrysler account, in the various consignment accounts treated separately *infra,* and in the Whirlpool account treated above, the details of the particular sales operation were disclosed by available data. As stated in *Owens-Corning,* Reynolds had substantial intrastate activities, or as therein characterized, "a bundle of corporate activity" which included resident sales forces, account servicing, warehousing, fabricating, subcontracting, all generating over $100,000,000 in sales in the audit period, and the mere mechanical process of order-entering is not in and of itself controlling. Reynolds failed to keep and demonstrate sufficient records to identify and segregate its intrastate and interstate activity to describe and flesh out a description of its activities generating the sales into meaningful categories or transactions so that an intelligent determination of the interstate commerce exemption could be made. As a result thereof, Reynolds has failed in its burden of proof under the doctrines of the *Mueller Brass, Owens-Corning,* and *Norton* cases.

## Issue VI. House accounts

Reynolds claims that the trial court erroneously failed to order a refund of gross income taxes collected on two house accounts of the Packaging Division, namely Chitfield Paper and Pretty Pak, following its protest. The record discloses that Frank Klinkose testified that the Department had granted exemptions for those two accounts. These were conceded by Klinkose as exempt. Reynolds claims that the total sales for those two accounts in Indiana were $653,494, and the sales exempted totalled only $485,872.

Reynolds' Exhibit 15 reflects sales by these two house accounts totalled $653,494, with exemptions of only $485,872 allowed. The evidence was not refuted by the Department at trial, and the argument on this issue is not met on appeal. The unrefuted evidence discloses that the Department allowed these house accounts exempt. However due to a mathematical error, Reynolds was not given the full credit. The trial court should amend its judgment and grant a refund on this item.

## Issue VII. Chrysler Corporation

■ Under this issue the evidence is undisputed that during the audit period Reynolds sold molten ingot to Chrysler Corporation for delivery to its plant in Kokomo, Indiana, pursuant to a written contract in the sum of $15,362,906, for which it was taxed. The contract, denominated by Reynolds as a "house account," was negotiated and executed by executives of the two corporations in Richmond, Virginia and Detroit, Michigan without any assistance from Reynolds' Indiana sales force. The contract provided for sale to Chrysler by Reynolds Mill Product Division of secondary aluminum alloy in molten form to be delivered in ladels F.O.B. Chrysler's furnaces in Kokomo. Reynolds retained the option to perform by subcontract, but at the sole risk and expense of Reynolds, who still warranted the product to Chrysler. Title passed from Reynolds to Chrysler upon delivery, and payment was due in Richmond to Reyn-

olds on the 10th and 25th of each month following receipt of an invoice. The contract was to be governed by Indiana law.

Reynolds, because of the impracticability of delivering to Kokomo the metal produced in its own reduction plants, which are located outside the state, subcontracted with U.S. Reduction Company, a Delaware corporation with its principal offices and foundry in East Chicago, Indiana, and Wabash Smelting, Inc., an Indiana corporation with its principal office and foundry in Wabash, Indiana, to perform the contract. The subcontract provided that Reynolds would deliver and stockpile, per specification and at its expense, Reynolds-owned scrap aluminum to each subcontractor's plant, title thereto remaining in Reynolds. The subcontractors were required to smelt and process the metal per specification and deliver it by truck to Chrysler's Kokomo plant in molten form. Reynolds agreed to deliver to the subcontractors one pound of scrap for each pound of metal delivered to Chrysler. The subcontractors warranted the process, and were liable to Reynolds for loss while the metal was in their possession. Reynolds had rights of inspection and rejection. Further, the subcontractors would, at Reynolds' expense, add metal from other sources to meet Chrysler's demand in the event that the scrap furnished by Reynolds proved insufficient. It was contemplated that the supplied scrap would go into the subcontractors' total reduction systems, and it was not required that the same metal supplied by Reynolds would be delivered, after smelting, to Chrysler. For their services, the subcontractors were to be paid by Reynolds a fee based upon an agreed formula.

The Department included the income received from all of these sales in Reynolds' taxable income. Reynolds claims none of it is taxable as the transactions were "house accounts," citing *Mueller Brass, supra,* and *Owens-Corning, supra.* The trial court stated in a Finding of Fact:

"2.24. Reynolds maintained inventories of raw material (scrap aluminum) at the U.S. Reduction Company Foundries in East Chicago and Wabash Smelting Company refinery in Wabash, Indiana, and shipped 100% of the smelted aluminum alloys from these inventory and fabricating services to the Chrysler Corporation Foundary in Kokomo."

Reynolds claims this finding is erroneous and unsupported by the evidence because the subcontractors were not agents of Reynolds but rather independent contractors operating under contract.

We first observe that although this is a house account it is wholly distinguishable from those at issue in *Mueller Brass* and *Owens-Corning,* because of the in-state performance of smelting and processing contracts by the subcontractors. Reynolds also relies heavily upon *Gross Income Tax Division, State of Indiana v. Warner Bros. Pictures Distributing Corp.,* (1954) 233 Ind. 345, 118 N.E.2d 117, cert. denied 348 U.S. 857, 75 S.Ct. 82, 99 L.Ed. 675, and *Gross Income Tax Division v. Surface Combustion Corporation,* (1953) 232 Ind. 100, 111 N.E.2d 50, cert. denied 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353. In *Warner Bros.,* the court held that the mere presence of personal property (film) in the state under a license to exhibit for a fee constituted an insufficient contact or nexus with the state to justify the imposition of tax. *Surface Combustion, supra,* concerned an Ohio corporation which manufactured furnaces in Ohio and which had made sales in Indiana. It had no facilities, agents, or salesmen of any kind in Indiana, but all sales were made from Ohio pursuant to Indiana customers' orders. The bulky, disassembled furnaces were shipped to the Indiana customers and assembled on the Indiana customers' property by the seller's employees. This was the only Indiana activity of Surface Combustion. The court, in an exhaustive analysis, distinguished sales contracts initiated from without the state where the subject of the sale was a standard, manufactured machine, such as a furnace, or organ, or other item of personal property, and contracts for the construction of buildings, or heating systems, consisting not only of a furnace, but pipes, ducts, registers, vents, labor, and other material as well. The latter are taxable because of the

substantial in-state activities necessary for construction. The former are not taxable, even though the contract calls for installation or assembly; such incidental activity does not destroy the interstate character of the transaction, as it is still a sale of an assembled machine. A contract to roof a house, said the court, is not a contract for the sale of shingles, as the shingles are only incidental to the contract. This case requires additional activity within the state over and above the sale and installation of a machine, object, or item of personal property. Differences exist between *Surface Combustion* and the case at bar.

We believe the case of *Gross Income Tax Division, State of Indiana v. Fort Pitt Bridge Works*, (1949) 227 Ind. 538, 86 N.E.2d 685, cited by the Department, is controlling here. Fort Pitt, a fabricator and erector of structural steel, was a Pennsylvania corporation with its principal office and place of business in Pittsburgh; it had never been admitted to do business in Indiana, and it did not have agents or facilities in Indiana. Hunter Construction Company, a general contractor, was an Ohio corporation with principal offices in Youngstown and was admitted to do business in Indiana. Youngstown Sheet and Tube was also an Ohio Corporation with principal offices in Youngstown, and it too was admitted to do business in Indiana, where it operated a steel plant in the City of Indiana Harbor. Fort Pitt and Hunter collaborated in bidding a contract let by Youngstown Sheet and Tube for the fabrication of steel and the erection of steel for new buildings at Sheet and Tube's Indiana Harbor plant. Fort Pitt was awarded the contract. Sheet and Tube's purchase orders were directed to Fort Pitt, which fabricated the steel and shipped it from its plants in Ohio and Pennsylvania to Hunter at Indiana Harbor, which, by prior agreement with Fort Pitt, received the steel, unloaded it, and erected it. All payments, totaling $1,421,847 under the contract, were made by Sheet and Tube to Fort Pitt, which retained $840,526 for fabricating and furnishing the steel. The balance of $494,037 was then remitted by Fort Pitt to Hunter as payment for its erection of the steel. All contract negotiations, the execution thereof, and payments thereon were transacted among the Ohio and Pennsylvania offices of Fort Pitt, Sheet and Tube, and Hunter. Fort Pitt did not enter Indiana in connection with the performance of the contract. All of the work in Indiana under the contract was performed by Hunter, and Hunter paid gross income taxes on its share of the contract proceeds. The issue in the case was whether Fort Pitt was liable for Indiana gross income taxes on its share of the proceeds. The court held that the entire gross receipts of the contract, $1,421,847, were taxable. It stated:

"Unless the activities, which are the subject of a tax, are carried on within the territorial limits of the taxing state by the one sought to be taxed, that state is without jurisdiction to impose the tax, and to do so constitutes a violation of the 14th Amendment to the Constitution of the United States. . . .

Activities within a state are local, even though they are connected with and affect, or are affected by, activities outside the state. . . .

"A corporation which contracts in the state of its residence to do work in a foreign state subjects itself to the jurisdiction of such foreign state, *notwithstanding it employs independent contractors to do the actual work and does no part of the actual work itself.*" (Citations omitted; emphasis added.)

227 Ind. at 545, 86 N.E.2d 685.

The court struck down the argument, similar to that made here by Reynolds, that Fort Pitt's proceeds were exempt because of Hunter's status as an independent contractor:

"Primarily the accomplishment of the work at Indiana Harbor was Fort Pitt's obligation. Essentially it was its business. It accomplished it through Hunter, without control of the manner or method of doing it. Nevertheless, Fort Pitt received income by reason of it, and that income was derived by Fort Pitt from the accomplishment of a result it had con-

tracted to accomplish in Indiana. It was derived from an activity in Indiana for which it was responsible. It came from its business in Indiana carried on through the medium of a subcontractor acting independently as to manner and method, but acting for Fort Pitt in the accomplishment of the result which it had contracted to bring about."

227 Ind. at 546–47, 86 N.E.2d 685. The court distinguished the transaction at issue from cases such as *Surface Combustion,* in which the contract was for the sale of a product, and the installation and assembly work was only incidental thereto. The court concluded that the contract was not a sales contract but a contract to furnish materials and erect buildings, and such called for activities and business local to Indiana. Such local business is taxable.

In the case at bar, the contract with Reynolds and Chrysler was not one to sell personal property (scrap aluminum) directly, as was selling a furnace in *Surface Combustion.* The performance of the contract was accomplished by stockpiling scrap aluminum in Indiana, smelting and processing it in Indiana, and delivering it in Indiana. As in *Fort Pitt,* such activity and business were local to Indiana and the proceeds are taxable. We perceive no distinction between this and a situation in which manufacturing occurs in Indiana, or a building is erected in Indiana as in *Fort Pitt.* As stated in *Fort Pitt,* the intervention of a subcontractor does not alter the matter, nor does the fact that it is a house account, for as stated in *Mueller Brass,*

> "This is not to say that under all circumstances that an account denominated a 'house account' by a foreign corporation would not be subject to the tax here in question. The nature of the contact between the state and the account determines the tax status of sales to it and not constitutionally appropriate appellations that may be attached to it."

255 Ind. at 538–39, 265 N.E.2d 704.

*Issue VIII. House account sales to consignment distributors*

Reynolds claims the trial court's decision is contrary to law in permitting taxation of income received from certain house account sales involving consignment agreements with four general line distributors. The distributors are: Jones & Laughlin Steel Warehouse Division, a Pennsylvania corporation with its principal office in Indianapolis; Joseph T. Ryerson & Son, Inc., a Delaware corporation with a warehouse in Indianapolis; C. A. Roberts Co., an Illinois corporation which maintains its principal office in that state and has warehouses in Indianapolis; and Vincent Brass and Aluminum Company, a Minnesota corporation that conducts business in Indiana. The house accounts were solicited, negotiated, and executed out of state at the executive level. The gross receipts in issue total $2,523,712.

The distributor agreement contracts contained the following features: Upon order of a distributor, Reynolds consigned products produced out of state to the distributor's Indiana warehouse at an agreed price. Title to the products remained in Reynolds until the products were withdrawn from the distributor's inventory. Payment was made to Reynolds monthly, based upon the withdrawals from inventory. The consigned goods were to be segregated in the distributor's warehouse for auditing purposes, although the distributor was not obliged to identify the goods as Reynolds' consigned inventory to its customers. The distributor assumed the risk of loss, it was responsible for insuring the products, with losses payable to Reynolds, and it was responsible for the payment of property taxes. The parties could agree to return nonsalable products, and Reynolds could, upon the distributor's bankruptcy or otherwise at will, demand return of consigned inventory. Reynolds warranted the product to the distributor, but not to the distributor's customers. The contract contained no provisions limiting the distributor in its sale of the product and the price it charged therefor, or the manner of distribution or disposition of the consigned goods. The contract specifically provided that the distributor was not Reynolds' agent, and had no right to deal in Reynolds' name or on Reynolds'

behalf. All of the distributors did business on a nationwide basis, as well as in Indiana, and the agreement was on a nationwide basis. The local Reynolds sales representative assigned to the account performed only incidental activities, in the nature of a liaison between the parties.

Absent the consignment feature common to these transactions, it is not argued that these four accounts do not qualify as exempt interstate transactions. The question disputed by the parties is whether the consignment contracts substantially constituted in-state warehousing and sales of goods, which would constitute taxable transactions for Reynolds.

We agree with Reynolds that the substance of a transaction is to be given effect over its form. *Wayne Pump Co. v. Dept. of Treasury, State of Indiana, Gross Income Tax Division*, (1953) 232 Ind. 147, 110 N.E.2d 284; *Meridian Mortgage Company, Inc. v. State*, (1979) Ind.App., 395 N.E.2d 433. Reynolds contends that the consignments were in substance financing or security devices, and the house accounts, negotiated and executed out of state, were exempt due to the lack of sufficient Indiana contacts at the time the agreements were made and at the times the products were shipped in accordance therewith. *See, Mueller Brass, supra; Owens-Corning, supra.* Conversely, the Department contends that even if the consignment agreements were negotiated and executed out of state, the subsequent sales made within the state constituted taxable transactions to Reynolds, particularly since legal title was retained by Reynolds until the sales were made by the consignees to their customers.

The Department cites three Indiana cases in support of its argument: *Department of Treasury v. Spindler Company, Inc.*, (1943) 222 Ind. 53, 51 N.E.2d 363; *Gross Income Tax Division v. Quick*, (1948) 226 Ind. 338, 78 N.E.2d 871, cert. denied 335 U.S. 860, 69 S.Ct. 135, 93 L.Ed. 407; and *Gross Income Tax Division v. Strauss*, (1948) 226 Ind. 329, 79 N.E.2d 103. *Spindler* upheld the tax liability of an in-state commission agent selling consigned goods on the account of

and in the name of the out-of-state consignor, Sears and Roebuck Company. *Strauss* and *Quick* involved the tax liability of Indiana farmers selling produce through a commission house in a foreign state. The Department charitably concedes that *Spindler* "does not stand baldly for the proposition that the Department can tax Reynolds on these consignment sales" and that *Quick* and *Strauss* "consider the issue but hardly clarify it." We are of the opinion that these cases are not relevant to the problem at hand.

Article 9 of the Uniform Commercial Code in Indiana, Ind. Code 26–1–9–101 *et seq.*, treats a consignment contract as a security interest. Article 9 applies to any transaction, regardless of its form, that is intended to create a security interest in personal property. Ind. Code 26–1–9–102(1)(a). A consignment intended as security is expressly included among the types of security devices to which Article 9 applies. Ind. Code 26–1–9–102(2). A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Ind. Code 26–1–1–201(37). The Uniform Commercial Code has abandoned any distinction among the various types of security devices. *See, Skendzel v. Marshall*, (1973) 261 Ind. 226, 301 N.E.2d 641, cert. denied 415 U.S. 921, 94 S.Ct. 1421, 39 L.Ed.2d 476. (*Skendzel* held that a conditional sales contract of real estate, wherein legal title is retained in the vendor, is a security device.) *See also*, Comment to West's A.I.C. 26–1–9–102. An entrusting of the possession of goods to a merchant who deals with goods of that kind gives the merchant the power to transfer all rights of the entruster to a buyer in the ordinary course of business, Ind. Code 26–1–2–403(2), even though an agreement purports to reserve title in the person making delivery until payment or resale, or uses such words as "on consignment." Ind. Code 26–1–2–326(3). A consignor must file a financing statement to protect its interest. Ind. Code 26–1–9–302(1); J. White and R. Summers, Uniform Commercial Code, § 22–4, p. 765 (1972).

White and Summers, *supra*, § 22–4, at p. 767 states:

"[T]he typical business consignment (and nearly all consignments are of the variety) is a security devise. One familiar with 'floor planning,' that is, the process whereby a seller or lender finances a retailer by taking a security interest in all of his inventory, should see the parallel between this process and consignment selling. Both are means of financing the retail seller's business with the wholesale seller's capital.... The principal purpose of such consignments is to finance the buyer and to maintain a kind of security interest in the seller."

Indeed, the tax code itself contemplates that the consignee is the taxpayer with respect to gross income received from the sale of goods on consignment. Ind. Code 6–2–1–1(m) states in part:

"That in case of consignment sales 'gross income' shall include the gross receipts from the sale of goods sold on consignment and the tax shall be paid thereon by the consignee."

Reynolds concedes that in the case of a "pure consignment," in which the consignee is the true agent of the consignor, sales made by the Indiana consignee would constitute Indiana sales by the consignor and would be taxable. Its position is that under the agreements here in issue, the consignees are not agents for Reynolds, in that Reynolds did not maintain sufficient control over the distributors, and that the arrangements constituted exempt interstate sales when first executed, with title retained by Reynolds as a security device. We agree with Reynolds' position here.

The primary test whether a transaction in the form of an agency to sell or consignment created the relation of buyer and seller or one of principal and agent was the intention of the parties to be gathered from the whole scope effect of the language used. 67 Am.Jur.2d *Sales* § 35. Examination of the agreements here discloses nothing more than a sale with a retained security interest. The products were shipped, upon order, for a stated price, warehoused in consignee's warehouse, (not Reynolds'), and insured by the consignee who paid the property tax, and the consignee was given power under the contract and the UCC to defeat Reynolds' title by sale to any person it desired in the normal course of business in its own name, at a price suitable to the consignee. In short the consignee had all of the indicia of ownership; no agency is involved. The Department does not contend that the retention of a security interest by an out-of-state seller is sufficient local activity or nexus to take the case out of the rule in *Mueller Brass* or *Owens-Corning*. We know of no authority for such result.

■ We therefore conclude that the income derived by the house accounts here at issue should be exempt. The mere maintenance of a security interest in goods located within the state is not a sufficient nexus with the state to justify the imposition of tax upon the secured party when the goods are ultimately sold by the consignee-distributor.

*Issue IX. Direct sales to distributors*

■ In addition to the consignment sales discussed in the preceeding issue, Reynolds made direct sales to the four general line distributors. These sales, which were house accounts solicited, negotiated and executed out of state, did not involve the consignment feature. The Department assessed gross income tax on the receipts from these sales, which total $1,267,372. Reynolds claims that the trial court erred by not determining that the income should be exempt, in that the activity generating the sale lacked the requisite nexus with this state to justify imposition of tax. The Department insists that Reynolds failed in its burden of proving the income should be exempt.

We think that Reynolds adduced sufficient proof as to the interstate character of these transactions and must reverse the trial court's judgment on this issue. The testimony of George O'Donnoghue, Reynolds' National Sales Manager for the Mill Products Division, reveals that the general line distributors made purchases directly from Reynolds in addition to the consignment contracts, and the only contacts with Reyn-

olds' Indiana personnel involved occasional reporting of problems by Indiana-based salesmen to the responsible Reynolds employee out of state. Additionally, John Detweiler, Reynolds' tax accountant, identified the direct sales to Indiana distributors. Further, Reynolds adduced an exhibit clearly showing the amount of direct sales claimed to be exempt under the heading:

"Customers treated as house accounts with whom consignment agreements had been reached, with volumes of sales from consigned goods *and direct shipment,* were as follows." (Our emphasis.)

Tr. p. 993.

Unfortunately, the trial court did not enter a finding regarding the direct sales. We find that Reynolds presented sufficient evidence concerning the interstate aspect of these sales and lack of sufficient contacts with Indiana to justify the tax. The exemptions should have been granted under *Mueller Brass, supra; Owens-Corning, supra.*

The judgment is reversed as to Issues VI, VIII, and IX (herein), and the cause is remanded for further proceedings consistent with our views expressed in the discussion of those issues. This cause is in all other respects affirmed.

Affirmed in part, reversed and remanded in part.

RATLIFF, P.J., and ROBERTSON, J., concur.